MARTHA BOYD, et al.

    *Plaintiffs*,

v.

    Civil Action No. ELH-17-2849

TYLER ARMSTRONG, *et al.*

    *Defendants*.

## MEMORANDUM OPINION

This civil rights case arises from the unfortunate death of twenty-one-year-old Tawon Boyd ("Mr. Boyd" or the "Decedent") on September 21, 2016, three days after an encounter with Baltimore County police on September 18, 2016. ECF 2 (the "Complaint").[1] In an Amended Complaint (ECF 16), plaintiffs Martha Boyd, the Decedent's mother, individually and as the Personal Representative of the Estate of Mr. Boyd, and Deona Styron, the Decedent's fiancé, individually and on behalf of Mr. Boyd's minor child, T.B., sued Baltimore County, Maryland (the "County"), as well as paramedic Kenneth Burns; emergency medical technician Tyler Armstrong (collectively, the "Medics" or the "Medic Defendants"); former Baltimore County Police Chief James W. Johnson, individually and in his official capacity; and several Baltimore County officers, individually and in their official capacities: Michael Bowman, D. Garland, Pearin D. Holt, Bryn M. Blackburn, and Joseph Seckens (collectively, the "Officer Defendants" or the "Officers").

In the early morning hours of September 18, 2016, Mr. Boyd "called 911 requesting assistance with what he believed to be an intruder in his home" in Baltimore County. ECF 16, ¶ 10. Plaintiffs allege, *inter alia*, that when the Officers arrived at Mr. Boyd's home, they

---

[1] Suit was filed in the Circuit Court for Baltimore County. The case was removed to federal court, based on federal question jurisdiction. *See* ECF 1 (Notice of Removal).

unlawfully detained him and subjected him to excessive force. *Id.* ¶¶ 18-31. The Complaint further asserts that the Medics inappropriately administered an antipsychotic drug, Haloperidol ("Haldol"), to Mr. Boyd, causing cardiac arrest and multi-organ failure. *Id.* ¶ 43. Mr. Boyd was transported to a hospital, where he died three days later. *Id.* ¶¶ 49-54.

The Amended Complaint is structured as two claims with multiple counts.[2] Claim I is labeled as a "Survival Action" and consists of six counts. Count I ("Assault") and Count II ("Battery") are filed against the Officers and the Medics. *Id.* ¶¶ 65-78. Count III is lodged under 42 U.S.C. § 1983 against the Officers and the Medics, asserting violations of the Fourth Amendment, the Fourteenth Amendment, and Articles 24 and 26 of the Maryland Declaration of Rights. *Id.* ¶¶ 79-82. Count IV asserts a claim against Chief Johnson and the County for "Negligent Supervision, Training, Retention and Custom or Policy of Deliberate Indifference." *Id.* Count V, lodged against the Medics, alleges "Gross Negligence." *Id.* ¶¶ 95-102. Count VI, as to all defendants, seeks recovery of funeral expenses. *Id.* ¶¶ 103-05. Claim II asserts a "Wrongful Death" action against all defendants. *Id.* ¶¶ 106-09.

The County has moved for summary judgment, pursuant to Fed. R. Civ. P. 56. ECF 43. The motion is supported by a memorandum of law (ECF 43-1) (collectively, the "County's Motion") and two exhibits. ECF 43-2 - ECF 43-3. Plaintiffs oppose the County's Motion (ECF 46), supported by several exhibits. *See* ECF 46-3 ("Notice of Lengthy Filing").[3] The County has replied (ECF 49) and submitted an additional exhibit. ECF 49-1.

---

[2] In an unrelated case, this Court commented on the confusing format utilized by the attorneys for plaintiffs. *See Jones v. Chapman*, ELH-14-2627, 2015 WL 4509871, at *2 n.13 (D. Md. July 24, 2015).

[3] Inexplicably, the exhibits were filed only in paper format, making citation to them quite difficult. For these exhibits, I have used the exhibit letters assigned by plaintiffs, without reference to ECF.

The Medic Defendants have also moved for summary judgment (ECF 44), supported by a memorandum of law (ECF 44-1) (collectively, Medics' Motion) and numerous exhibits. ECF 44-3 - ECF 44-16. Plaintiffs oppose the Medics' Motion (ECF 48), accompanied by numerous exhibits. *See* ECF 48-3 ("Notice of Lengthy Filing"). The Medics have replied (ECF 51), and submitted another exhibit. ECF 51-1.

The Officers moved only for partial summary judgment, with respect to Count III, limited to the issue of whether they had probable cause to seize and detain Mr. Boyd for an emergency mental health evaluation. ECF 45. The motion is supported by a memorandum of law (ECF 45-1) (collectively, the Officers' Motion) and several exhibits. ECF 45-3 - ECF 45-15. Plaintiffs oppose the Officers' Motion (ECF 47), supported by exhibits. *See* ECF 47-3 ("Notice of Lengthy Filing").[4] The Officers replied (ECF 50) and submitted additional exhibits. ECF 50-1 - ECF 50-3.

Also pending is plaintiffs "Motion to Strike Defendants' Expert Reports and to Exclude Defendants' Proposed Experts from Participation at Trial," pursuant to Fed. R. Civ. P. 37(c)(1). ECF 38. The motion is supported by a memorandum of law (ECF 38-1) (collectively, the "Motion to Strike"). Plaintiffs contend that defendants' expert reports are "untimely, improper, and should be stricken as unduly prejudicial," for failure to comply with the disclosure requirements of Fed. R. Civ. P. 26(a)(2). ECF 38-1 at 4. Defendants oppose the Motion to Strike (ECF 39), supported by four exhibits. ECF 39-1 - ECF 39-4. Plaintiffs did not reply, and the time to do so has passed. *See* Local Rule 105.2(a).

---

[4] Plaintiffs appended the same set of exhibits in opposition to all three motions. *See* ECF 46-3; ECF 47-3; ECF 48-3.

In addition, pursuant to Fed. R. Civ. P. 56(c)(2), plaintiffs filed an "Objection to and Motion to Strike [ECF] 50-3" (ECF 52, "Objection"), supported by exhibits. ECF 52-2 - ECF 52-3. The Objection concerns ECF 50-3, titled "Baltimore County Police Department Standard Operating Procedure," which is an exhibit appended to the Officers' reply. Plaintiffs assert that ECF 50-3 it is "not self-authenticating" and is therefore "inadmissible." ECF 52, ¶ 9. Further, they argue that they "have not had the opportunity to rebut or challenge the contents of the newly revealed material" and that they "would be unduly prejudiced if the Court were to consider [ECF 50-3] in its ruling" on the defense summary judgment motions. *Id.*

Defendants oppose the Objection (ECF 53), supported by three exhibits. ECF 53-1 - ECF 53-3. Plaintiffs did not reply, and the time to do so has expired. *See* Local Rule 105.2(a).

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall grant the County's Motion (ECF 43); grant the Medics' Motion (ECF 44); and grant the Officers' Motion (ECF 45). I shall deny plaintiffs' Motion to Strike (ECF 38), and I shall deny the Objection (ECF 52). As a result of these rulings, the case shall proceed as to the Officer Defendants.

## I.    Factual Background

At the relevant time, Mr. Boyd lived in a townhouse community in the County with his fiancé, Styron; their three-year-old son, T.B.; and Mr. Boyd's grandmother, Linda Burch, who was suffering from dementia. ECF 45-7 (Styron Deposition) at 3-4.

At or about 3:06 a.m. on September 18, 2016, a frantic call was placed to 911 by Mr. Boyd. ECF 45-4 ("Call Records") at 9. He repeatedly asked for help. ECF 45-3 (911 Audio).[5] During

---

[5] As noted, plaintiffs allege Mr. Boyd said there was an intruder in the home, but that was difficult to discern from the call. *See* ECF 16, ¶ 10.

the phone call with the 911 dispatcher, a woman, later identified as Styron, can be heard "yelling in the background." ECF 45-4 at 4.

According to the Call Records, Mr. Boyd was "very difficult to understand over all of the background noise." *Id.* at 8. As a result, the dispatcher directed Mr. Boyd "to go outside several times." *Id.* Mr. Boyd responded that "everything was ok," but the dispatcher noted that the "female was still screaming in the background." *Id.* at 9. About ten minutes into the call, Styron said to the dispatcher, "Tell them to hurry up." *Id.* at 10.

At about 3:09 a.m., Officer Seckens arrived at Mr. Boyd's home. *Id.* Officer Seckens, who was in uniform, encountered Mr. Boyd and Styron "out front kind of arguing back and forth, yelling and screaming at each other." ECF 45-5 (Seckens Deposition) at 6; *id.* at 5. According to Seckens, Mr. Boyd seemed to be "very paranoid," *id.* at 4, and "was sweating profusely." *Id.* at 6. Mr. Boyd gave his driver's license to Seckens and identified himself as Tawon Boyd. *Id.* at 4.

At Seckens' deposition, he described his initial encounter with Mr. Boyd and Styron as follows, ECF 45-5 at 4:

> I just tried to speak to both of them out front, what was going on, what was wrong. I immediately knew that, it was immediately apparent Mr. Boyd was just not acting right. Like I said before, he wasn't speaking with me. He was very paranoid, as if someone was after him, was looking around, claiming people were in the house and Ms. Styron got him intoxicated and was recording him. So he was not acting as a normal person should.

Shortly after the arrival of Seckens, Officer Garland arrived at the home, followed by Officer Bowman. ECF 45-9 (Garland Deposition), at 3-4. Garland testified that Boyd "was sweating like profusely . . . ." *Id.* at 4. He added, *id.*: "[T]hat's the most sweating I've ever seen [from] somebody." *Id.*

Garland entered the residence with Styron to separate her from Mr. Boyd and "to try to get her side of the story." *Id.*; *see also* ECF 45-7 at 4. According to Garland, this was standard

5

procedure in handling domestic disputes. ECF 45-9 at 3. Garland questioned Styron in the living room. *Id.* at 5. Garland and Styron were unable to see Mr. Boyd, Seckens, or Bowman, all of whom were outside. *Id.*; ECF 45-7 at 5.

According to Garland, Styron reported that Mr. Boyd had been drinking and smoking marijuana during the evening. ECF 45-9 at 5. Garland testified at his deposition, *id.*:

> [Styron] said that they were down [at] the Inner Harbor, and that [Mr. Boyd] had been drinking. And then they stopped at a cousin's house on the way back home. And she believed that he was smoking marijuana with one of the cousins or something. I asked her if it was just marijuana because of all the sweating. And she said she's not sure because she wasn't with him when he was smoking because they went out back or something. So she wasn't actually with him when he was smoking the marijuana.

Styron vigorously disputes Garland's account of their conversation. ECF 45-7 at 5. In her words, Garland said that Mr. Boyd "got to be on drugs or something because of the way he was sweating," but she "was telling [Garland] that he wasn't." *Id.* She maintains that the officer kept "insisting" that Boyd was on drugs, but she "kept telling him that he wasn't . . . ." *Id.* at 6.

Bowman, who was outside with Mr. Boyd, observed that Mr. Boyd appeared "very fidgety" and "wanted to check all his surroundings, look[ing] everywhere around." ECF 45-10 (Bowman Deposition), at 4. Bowman also noticed that Mr. Boyd was "sweating" and "it wasn't that kind of a hot night outside or anything." *Id.*

The Officers were of the view that Mr. Boyd was intoxicated or suffering from a medical emergency. ECF 45-5 at 4; ECF 45-10 at 4. Bowman explained, ECF 45-10 at 4:

> [T]he way he was kind of looking around, almost as if he was seeing other things that weren't there, just kind of checking all the surroundings, and the words that, you know, somebody hiding in the attic, you know, somebody is out to get him, you know, his girl was trying to get him intoxicated, trying to set him up, made me think that it was a possible combination of the drugs and some other mental health issue.

6

As Seckens was attempting to speak with Mr. Boyd, and without provocation, Mr. Boyd ran away from the officers and attempted to get into Seckens's vehicle. ECF 45-5 at 5; ECF 45-10 at 4. He was "screaming, Help! Call the police." ECF 45-5 at 5. Seckens and Bowman "immediately gave chase to him to prevent him from gaining access to [the] car." *Id.* Mr. Boyd attempted to enter the driver's side of the vehicle, but the door was locked. *Id.* He then ran to the next parked vehicle, but Officer Bowman blocked Mr. Boyd from getting inside. *Id.* at 6-7. Thereafter, Mr. Boyd ran to a neighbor's house across the street, while screaming for help and asking for someone to call the police. ECF 45-5 at 7; ECF 45-10 at 5.

Officer Garland, who was still with Styron inside the townhouse, "heard yelling and screaming." ECF 45-9 at 4. When Garland "came out," he "saw Mr. Boyd . . . running across the street and yelling and hollering for the police, call 9-1-1." *Id.* So, Garland "went over at the same time Officer Seckens and Officer Bowman were following [Mr. Boyd] across the street." *Id.* Garland recalled, ECF 45-9 at 5:

> So we like tried to get him to calm down and turn around because we didn't want him – the way those houses are set up, if you go in those doors it's a kitchen. No weapon yet. We don't want somebody breaking in a house and having something else, somebody else in another house. So we tried to get him away from the house is [sic] what we try to talk them [sic] to getting down away from the door first. And then when he turned around, that's when myself and Officer Seckens tried to just grab him to pull him away from the house. But at that time I slipped off of him because of being sweaty, I kind of slipped. And it was hard for us to get a grip. And that's when all three of us kind of [sic] just struggling to try to get him away from the door and to get him down and get him into custody.

Similarly, Bowman testified, ECF 45-10 at 5:

[Mr. Boyd] continued banging on the door. . . . we didn't have a huddle where we just kept discussing what was going on, but everyone seemed to be on the same page. We didn't want the person opening the door because we don't know what's behind the door or necessarily know what's going to happen with another person or in a whole other building. So at that point it was, all right, grab him and let's go get him into custody.

7

Seckens claimed that he and Garland "attempted to just grab [Mr. Boyd], grab him by his arms and take him down to the ground." ECF 45-5 at 7. But, Boyd "was doing anything to get away . . . ." *Id.* Seckens recalled, *id.*: "At one point when we grabbed a hold of him, that's when he reached back and he actually grabbed the back of my neck, and . . . scratched the back of my neck. But we were able to eventually get him on the ground." *Id.* Mr. Boyd did not have any weapons in his hand. ECF 42-10 at 5.

By the time Styron came outside, Mr. Boyd was on the ground. ECF 45-7 at 6. Styron testified: "They had tossed [Mr. Boyd] on the ground, actually. They started jumping on top of him . . . . There were so many officers out there." *Id.*

At approximately 3:29 a.m., an unidentified voice "screamed in the radio for a medic." ECF 45-4 at 10. As reflected in the Call Records, the dispatcher referred to Mr. Boyd as a "psych patient," "in custody," with "minor injuries." *Id.* at 11.

Armstrong and Burns immediately responded to the call, with Burns driving the ambulance and Armstrong in the passenger seat. ECF 48-3 (Exhibit E, Armstrong Deposition) at 9; *see also* ECF 44-3 (Armstrong Deposition).

Armstrong testified that when he and Burns arrived at the scene, "it was pretty dark out," but "it was obvious there was like a struggle ensuing between" Mr. Boyd and the Officers. Exhibit E at 11. Armstrong recalled: "[T]he police officers were giving commands to [Mr. Boyd] to calm down" and "were trying to hold him down and restrain him, like handcuff him. And he was like bucking the police up off of him . . . ." *Id.* Armstrong briefly "went up to look at [Mr. Boyd] and the police officers at the head of [him]." *Id.* at 14. Mr. Boyd was face down on the ground, with his hands cuffed "in the front," as approximately five officers held down his legs and face. *Id.* at 12-13.

8

Burns explained in deposition that he saw at least two officers "holding [Mr. Boyd's] limbs . . . . They were holding him down that's all." ECF 48-3 (Exhibit K, Burns Deposition); *see also* ECF 44-4 (Burns Deposition) at 3.

Armstrong immediately ran back to the ambulance to get supplies. Exhibit E at 17. At the same time, Burns approached Mr. Boyd's family members, Styron and Burch, who were standing outside. Exhibit K at 15. Burns spoke with them for "maybe five minutes," obtaining "pertinent information," such as Mr. Boyd's "name, age, [and] any health issues[.]" *Id.* at 16. As Burns was speaking with them, he "tr[ied] to relay any pertinent information to [Armstrong]" but Armstrong may not have heard him because "it was a pretty good ruckus going on out there." *Id.* Burns then "[w]ent to go get the stretcher." *Id.*

Based on Armstrong's "clinical judgment from previous cases," and his observations of "the way [Mr. Boyd] was acting," Armstrong decided to administer Haldol to him. Exhibit E at 28; *id.* at 20. In deposition, Armstrong described Haldol as an "anti-psychotic medication to calm violent individuals." *Id.* at 20. At approximately 3:36 a.m., as the Officers continued to restrain Mr. Boyd, who was prone on the ground, Armstrong injected 5mg of Haldol in Mr. Boyd's right deltoid muscle. *Id.* at 34, 49; *see also* ECF 44-11 at 49; ECF 44-5 at 3.

At his deposition, Armstrong was asked why he decided to administer Haldol. Armstrong answered: "Obviously there was a confrontation between [Mr. Boyd] and the police department. . . . [Mr. Boyd] was bucking the police officers off. They were attempting to hold him down. And so it appeared that he was pretty violent to me." Exhibit E at 20. Therefore, Armstrong wanted "to sedate [Mr. Boyd] and calm him down, that way he d[idn't] have to be restrained or was no longer fighting." *Id.* at 20-21.

9

After Armstrong administered the Haldol, he waited by Mr. Boyd's side until Mr. Boyd calmed down to "assess[] his vital signs and treat him further." *Id.* at 35. Within two minutes, Mr. Boyd became calm. *Id.* at 36; *see also* ECF 44-11 at 3. The Officers checked Boyd's pulse and confirmed that he was still breathing. ECF 44-11 at 4. They then "rolled him onto his side" in a "recovery position." *Id.* Immediately thereafter, Armstrong observed Mr. Boyd's body go "limp." Exhibit E at 43. Armstrong determined that Mr. Boyd was in cardiac arrest; Mr. Boyd did not have a pulse and was not breathing. *Id.*

Armstrong and Burns loaded Mr. Boyd onto a stretcher "to begin assessing him rapidly." *Id.* at 45. According to Armstrong, it was a "[v]ery short period" before Mr. Boyd was on the stretcher. *Id.* at 48. However, Armstrong waited to perform cardiopulmonary resuscitation ("CPR") on Mr. Boyd until they had wheeled Mr. Boyd to the ambulance. *Id.* At his deposition, Armstrong explained, *id.* at 46-47:

> . . . I mean, it's my job to give direction to others surrounding me who were pretty much performing care under my supervision that will benefit the patient the most. And I believe if we started doing CPR on him – a lot of times when you do CPR on people that are dead in front of family members they have a tendency to latch on. And that would prevent care from him. So we loaded him into the unit. It was in his best interest without a doubt.

Further, Armstrong testified: "I wasn't going to do that in front of his family . . . [with] an incident like this I didn't want to cause like an uproar in the community. That would prevent me from treating the gentleman in the back of the ambulance." *Id.* at 45-46.

At approximately 3:42 a.m., Armstrong began performing CPR on Mr. Boyd in the ambulance. ECF 44-5 at 3; Exhibit E at 49. Officer Holt assisted Armstrong. *See* ECF 44-12 (Answer to Interrogatory 19). Armstrong also applied the defibrillator pads on Mr. Boyd, secured an airway, and started an IV line of epinephrine and fluids. Exhibit E at 65-66; *see also* ECF 44-

5 at 3. By approximately 3:56 a.m., Mr. Boyd regained a pulse (ECF 44-5 at 3) but Mr. Boyd was still "unresponsive." *Id.* at 2.

When Mr. Boyd's blood pressure "started to decline a little bit," Armstrong gave him a medication to elevate it (Exhibit E at 63) and contacted Dr. Park, the physician on call in the Emergency Department of Franklin Square Hospital. *Id.* at 66. Armstrong obtained Dr. Park's permission to administer Dopamine to Mr. Boyd. ECF 44-5 at 2. But, Mr. Boyd did not regain consciousness. *Id.*

On arrival at the Emergency Department, Mr. Boyd was already "intubated" but was "nonresponsive." ECF 45-11 ("Hospital Records"), at 3. Pursuant to the Baltimore County Police Department Field Manual ("Field Manual," ECF 45-14), Mr. Boyd became "the responsibility of the hospital." *Id.* at 4. Armstrong briefed Dr. Park on the treatment he had administered to Mr. Boyd. Exhibit E at 66. Mr. Boyd showed "improvement" in blood pressure, with "dilated non reactive[] pupils with left sided gaze." ECF 44-5 at 2. The Hospital Records also reflect that Mr. Boyd had "metabolic acidosis." ECF 45-11 at 3. Moreover, Mr. Boyd's "[u]rine toxicology was . . . positive for cannabinoid and ethanol," which are the active ingredients for marijuana and alcohol, respectively. *Id.*

The Hospital Records further state, in relevant part, *id.*:

> HISTORY OF PRESENT ILLNESS: This is a 21-year-old male with history of marijuana and Molly use with no other past medical history who was brought to the [sic] unresponsive after a cardiac arrest in the field. According to the patient's family and girlfriend, he was with his girlfriend when he left the house to smoke marijuana and came back acting very strangely. He was paranoid and thought somebody was in the house. The police were phoned. The police came, he did not realize who it was and ran to the neighbor's house for help where he was found trying to break in. EMS was called and 6 officers were required to subdue the patient. He was very combative and fighting restraints. In the field he was given Haldol 5 mg and then subsequently went into responses pulseless asystole. CPR was done for 3 minutes and he was given epinephrine as [sic] started on dopamine

11

and given 1 T of IV fluids. In the field, it was noted that his pupils were fixed and dilated at the time.

Later that morning, Mr. Boyd was admitted to the Intensive Care Unit with multi-organ failure and severe encephalopathy. ECF 45-11 at 2. Three days later, Mr. Boyd was taken off of life support. He died at 11:01 a.m. on September 21, 2016. *Id.*

The next day, Dr. Russell Alexander, an assistant medical examiner in the Office of the Chief Medical Examiner, performed an autopsy on the Decedent. ECF 44-6 ("Autopsy Report"); ECF 45-12 ("Autopsy Report"). Dr. Alexander classified the death as an "Accident" and concluded that the cause of death was "Complications of N-Ethylpentylone Intoxication." ECF 44-6 at 2. The Autopsy Report also notes: "Subject took drug and then suffered a cardiac arrest following restraint by law enforcement." *Id.* Dr. Alexander noted several abrasions on Mr. Boyd's body. *Id.* at 3.

Armstrong signed the Maryland Institute for Emergency Medical Services Systems ("MIEMSS") Prehospital Care Report on September 18, 2016. ECF 44-5 ("MIEMSS Report"). He indicated in the MIEMSS Report that he "believe[d]" Mr. Boyd was "in excited delirium state" ("ExDS"). At his deposition, Armstrong explained the condition of ExDS, Exhibit E at 22-23:

> So excited delirium actually is still like a fresh topic in the EMS [Emergency Medical Services] and in emergency medicine. And it's very hard to diagnose, especially in the field. But from my understanding it's probably it's probably [sic] the best way of putting it, is that it is violent subjects after some form of ingesting or induction of a stimulant or some form of chemical that makes them become manic.

Each year, on July 1, MIEMSS revises the Maryland Medical Protocols for Emergency Medical Services Providers. *See* ECF 44-7 ("EXDS 2016 MIEMSS Protocol"); ECF 44-8 ("HALDOL 2016 MIEMSS Protocol"). Baltimore County Fire Department paramedics are required to review the annual updates online. *Id.* MIEMSS then notifies the Fire Department

when each paramedic has done so. *Id.* Armstrong testified at his deposition that, prior to July 1, 2016, he had completed an online review of the 2016 revisions to the Protocols. Exhibit E at 24.

Under Section LL, titled "Excited Delirium Syndrome (ExDS)," the 2016 MIEMSS Medical Protocols (the "2016 Protocols") defined ExDS as follows, ECF 44-7 at 3:

> Excited delirium syndrome (ExDS) is a potentially life-threatening condition in which a person is in a psychotic and extremely agitated state. Mentally, the subject is unable to process rational thoughts or to focus his/her attention. Physically, the body's systems are functioning at such a high rate that they begin to shut down and fail. When those two factors occur at the same time, a person can act erratically enough that he/she becomes a danger to self and to the public.

The 2016 Protocols listed several causes of ExDS: "(1) Ingestion of a stimulant or hallucinogenic drug; (2) Drug/alcohol withdrawal; (3) Psychiatric patient who is off medication." *Id.* In addition, the 2016 Protocols provided numerous "signs and symptoms" of the condition, including high body temperature; incoherent or nonsensical speech; paranoia; hot/dry skin; and profuse sweating after ingesting cocaine, Methylenedioxymethamphetamine, or what is commonly known as MDMA, Molly, or Ecstasy; or methamphetamine. *Id.*

Of significance here, the 2016 Protocols, which exceeded 200 pages, included an "ALERT" that explicitly warned emergency personnel not to administer Haldol to patients exhibiting symptoms of ExDS. It stated, in capital letter, as follows, *id.* at 5:

> PATIENTS DISPLAYING SIGNS AND SYMPTOMS OF EXDS SHOULD NOT RECEIVE HALDOL AND/OR BENADRYL FOR CHEMICAL RESTRAINT. THESE MEDICATIONS MAY WORSEN AN ANTICHOLINERGIC CRISIS. HALDOL MAY INCREASE THE POSSIBILITY OF CARDIAC DYSRHYTMIA BY PROLONGING THE QT INTERVAL AND MAY ALSO INCREASE THE CHANCES OF A SEIZURE BY LOWERING THE BODY'S SEIZURE THRESHOLD.

In the same section, the 2016 Protocols included a second alert, as related to ExDS, *id.* at 4:

13

PATIENTS DISPLAYING SIGNS AND SYMPTOMS OF EXDS SHALL BE TREATED AND TRANSPORTED AT THE ADVANCED LIFE SUPPORT LEVEL. . . . THE APPROPRIATE LIFESAVING TREATMENT FOR EXDS IS THE ADMINISTRATION OF BENZODIAZEPINES, FLUID RESUSCITATION, AND DECREASING HYPERTHERMIC CORE BODY TEMPERATURE.

In regard to suspected ExDS, the 2016 Protocols instructed emergency personnel to administer midazolam, a benzodiazepine, "in 2 mg increments . . . over 1-2 minutes" via "IV" (or "IO." *Id.*[6] The 2 mg increment "[m]ay be repeated twice to a maximum . . . dose of 6 mg . . . ." *Id.* If IV or IO access is not available, the 2016 Protocols advise personnel to administer up to 5mg of midazolam via IM (intramuscular) injection. ECF 44-7 at 4-5. Notably, if a patient appears violent, "[a]ppropriate physical restraint procedures should be utilized . . . ." *Id.* at 4.

Yet, in the Section of the 2016 Protocols related to the use of Haldol, the 2016 Protocols remained unchanged, with no alert posted. ECF 44-8 at 3. In Section 19, titled "Haloperidol (Haldol)," the 2016 Protocols listed four "contraindications": "(1) Children under 5 years of age; (2) Parkinson's disease; (3) CNS [Central Nervous System] depression; (4) Acute CNS Injury." Obviously, these warnings did not involve ExDS. *Id.* In contrast, the 2018 MIEMSS Medical Protocols, effective July 1, 2018, list Haldol as contraindicated for "Excited delirium." ECF 44-9 ("HALDOL 2018 MIEMSS Procol"), at 3.

Additional facts are included, *infra*.

## II.    Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and

---

[6] "IV" is an abbreviation for intravenous. "IO" is an abbreviation for intraosseous. Intravenous is defined as "within a vein or veins," and intraosseous is defined as "within a bone." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (32d ed. 2012).

the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86.

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. In resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to

the nonmoving party. *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *accord Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). However, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Moreover, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

### III. Motion to Strike

Plaintiffs move to strike defendants' expert reports and to exclude defendants' proposed experts from participation at trial, pursuant to Fed. R. Civ. P. 37(c)(1). ECF 38. They contend that defendants failed to timely disclose their designation of experts, and failed to include "a certificate regarding service or a certificate regarding discovery identifying the purpose of the disclosures," in violation of Fed. R. Civ. P. 26(a)(2). ECF 38-1 at 2.

Pursuant to the Court's Scheduling Order (ECF 31), defendants' Rule 26(a)(2) disclosures were due on March 28, 2018. Defendants failed to comply with that deadline, although the delay was quite brief. In an email exchange of March 29, 2018, defense counsel, Paul M. Mayhew, communicated to plaintiffs' counsel, Latoya Francis-Williams, that he would send the disclosure materials the next day, on March 30, 2018. Francis-Williams did not object. *See* ECF 39-3 (Mayhew: "I will be providing our Rule 26 materials tomorrow. Are we still doing the depositions on April 4th?" Francis-Williams: "Yes we are. Thank you.").

On March 31, 2018, three days after the court-imposed deadline, plaintiffs' counsel received the Rule 26(a)(2) materials. *See* ECF 38-2 (noting "Expected Delivery Date" as "03/31/2018"). The materials contained two expert reports: Charles J. Key, Sr., the former Commanding Officer of the Firearms Training Unit of the Baltimore City Police Department (ECF 39-1), and Dr. L.J. Dragovic, the Chief Forensic Pathologist/Chief Medical Examiner of Oakland County, Michigan (ECF 39-2). Plaintiffs filed the Motion to Strike on April 3, 2018. ECF 38.

"In order to clear up any claimed confusion," defendants provided plaintiffs with a separate designation of experts on April 5, 2018. ECF 39-4 (Defendants' Expert Designations and Disclosures). Pursuant to Rule 26(a)(2), defendants designated Key and Dragovic as defense experts. *Id.* at 1-2.

Pursuant to Rule 26(a)(2)(A), "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Rule 26(a)(2)(B) provides that an expert witness disclosure must be accompanied by a written report that contains:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;

17

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

This disclosure must be made "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Further, "[f]or an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2).

If a court finds that a party's expert disclosure was untimely, the court must then determine the appropriate sanction. Fed. R. Civ. P. 37(c)(1) provides that if a party fails to disclose a witness pursuant to Rule 26(a) or (e), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." And, Rule 37(c) also permits the court to "order payment of the reasonable expenses, including attorney's fees caused by the failure;" "inform the jury of the party's failure;" and "impose other appropriate sanctions," including those "listed in Rule 37(b)(2)(A)(i)-(vi)."

Of relevance here, in determining whether a party's untimely disclosure of evidence is substantially justified or harmless, "district courts are accorded 'broad discretion.'" *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 190 (4th Cir. 2017) (citing *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014)); *see also Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). In the exercise of their discretion, district courts are guided by the following factors, *Southern States*, 318 F.3d at 597:

(1) the surprise to the party against whom the evidence would be offered;

18

(2) the ability of that party to cure the surprise;

(3) the extent to which allowing the evidence would disrupt the trial;

(4) the importance of the evidence; and

(5) the nondisclosing party's explanation for its failure to disclose the evidence.

*See also Bresler*, 855 F.3d at 190; *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396-97 (4th Cir. 2014).

The first four factors "relate primarily to the harmlessness exception" of Rule 37(c)(1), and the fifth factor "relates mainly to the substantial justification exception." *Bresler*, 855 F.3d at 190. "The party failing to disclose information bears the burden of establishing that the nondisclosure was substantially justified or harmless." *Id.*

In *Southern States*, 318 F.3d at 599, the Fourth Circuit concluded that the district court did not abuse its discretion in excluding expert testimony concerning a new opinion belatedly disclosed on the first day of trial. Upon review of the five factors, the district court concluded that (1) the new opinion surprised the defendant because the plaintiff's expert indicated that he had completed his opinions in initial reports; (2) the defendant was unable to cure this surprise because the defendant's ability to simply cross-examine the expert about the new opinion was insufficient, and expert disclosure is designed to allow an opponent to examine an expert report for flaws and develop counter-testimony; (3) granting a continuance to accommodate the new opinion would have significantly disrupted the trial, because if the case were continued and tried again, much of the parties' trial preparation would have been wasted; (4) the new opinion was important evidence but that also pointed to why it should have been disclosed in a timely manner; and (5) the plaintiff could not explain why it did not supplement its discovery responses when it knew of the new opinion. *Id.* at 598.

In *Bresler*, 855 F.3d at 190, the plaintiffs timely served the defendants with a copy of an expert report in June 2012. On July 3, 2012, the district court granted the parties' joint motion for

19

an extension of certain deadlines regarding expert witness disclosures. *Id.* at 191. Per the court's order, the parties were required to provide supplemental expert witness reports and corrections to existing expert witness reports by August 21, 2012. *Id.* "The order further provided that discovery concerning expert witness opinions would conclude on October 23, 2012." *Id.* Then, in early November 2013, the plaintiffs provided the defendant with an exhibit that contained a new formula and associated calculations that were not originally submitted in the June 2012 report. *Id.* at 191-92. The district court denied the defendant's motion to exclude the expert's testimony on the ground that the exhibit "contained a new formula that had not been disclosed before the deadlines for expert witness disclosures." *Id.* at 192.

The Fourth Circuit agreed that "the plaintiffs violated the disclosure requirements for expert witnesses in Rule 26," because the formula and calculations "should have been included in the June 2012 report." *Id.* at 193. However, the *Bresler* Court determined that the district court did not abuse its discretion in admitting the expert testimony, finding that "the plaintiffs' "noncompliance with Rule 26 was harmless in the context of the events that transpired." *Id.*

In arriving at this conclusion, the Fourth Circuit thoroughly reviewed the five *Southern States* factors. First, the Court "observe[d] that any surprise resulting from the plaintiffs' belated disclosure" of the formula and calculations was "minimal," because the June 2012 report put the defendants on notice that the plaintiff's expert "might use an updated chart or spreadsheet in the course of the litigation." *Id.* Second, the Fourth Circuit reasoned that the defendants had an "ability to cure any surprise," because they had access to the expert testimony for nearly two months before the trial began, and the record did not indicate that an earlier disclosure would have enabled the defendant "to conduct additional cross-examination" of the expert or "to introduce competing evidence at trial." *Id.* at 194. Third, the *Bresler* Court determined that the record "d[id]

not indicate any significant disruption" at trial by the district court's decision to admit the expert testimony and to allow the expert to testify. *Id.* Fourth, the Court asserted that the expert testimony was "vital evidence, because it provided the basis for the jury's damages award." *Id.* Fifth, the Fourth Circuit found that the plaintiffs did "not provide[] a sufficient explanation" for not including the testimony in the June 2012 report. *Id.* Although the last two factors weighed in favor of the defendant, the Court concluded that the district court did not abuse its discretion by allowing the testimony because of the minimal "surprise" to the defendant and the defendant's ability to cure any surprise. *Id.*

Here, a balancing of the five factors weighs heavily in favor of defendants. The disclosure of defendants' expert reports came as no surprise to plaintiffs. To be sure, defendants' Rule 26(a)(2) disclosures were late. They were due by March 28, 2018. ECF 31. But, one day later, defense counsel notified counsel for plaintiffs that he would send the materials by March 30, 2018. ECF 39-3. Plaintiffs' counsel received the information on March 31, 2018—only three days after the court-imposed deadline. ECF 38-2. Plaintiffs cannot seriously claim prejudice from the very brief delay.

Moreover, despite the absence of a formal designation of the experts, the enclosed expert reports contained all of the necessary information that the plaintiffs would need to file their rebuttal as to defendants' Rule 26(a)(2) disclosure by April 11, 2018. Plaintiffs' contention that they were "confused" as to whether defendants had designated both Key and Dragovic as experts is unpersuasive. ECF 38-1 at 6. Key's report, titled "*Expert Opinion* of Charles J. Key, Sr.," contains a section about his expert qualifications, and includes the title of "expert opinion" on every page of the report. ECF 39-1 (emphasis added). As to Dr. Dragovic's report (ECF 39-2), it describes

Dragovic as an expert forensic pathologist and medical examiner, and her curriculum vitae includes a 14-page list of cases in which Dr. Dragovic has testified as an expert. *Id.* at 5-49.

Of course, the expert information contained in the reports is highly important to the defense case. As to the final factor, defendants explain the delay, stating that Dr. Dragovic "was out of the country for much of March [2018]" and "his offices are in Michigan." ECF 39, ¶ 1. The excuse is not compelling, but it is adequate to explain the brief delay.

In sum, I am not persuaded that the draconian relief sought by plaintiffs is warranted here. I shall deny plaintiffs' Motion to Strike (ECF 38).

## IV.   Objection

Pursuant to Fed. R. Civ. P. 56(c)(2), plaintiffs object to the Court's consideration of Baltimore County Police Department Standard Operating Procedure ("SOP"), docketed at ECF 50-3. *See* ECF 52. The SOP sets forth the investigative responsibilities of the Behavioral Assessment and Crisis Management Unit ("BACMU"). ECF 50-3 at 1. The BACMU is divided into three teams, including the Mobile Crisis Team ("MCT"). *Id.*

The SOP states, in relevant part, *id.*:

> The Mobile Crisis Team's (MCT) primary purpose is to provide comprehensive mental health services to persons in crisis. The goals of the unit are to match mental health services to the person in crisis by offering alternatives to emergency petitions, increase access to the mental health system, reduce the patrol officer's time in handling emergency evaluations and increase disposition/placement options for police officers responding to the crisis calls. The Mobile Crisis Team pairs a specially trained police officer with a mental health clinician. This team assesses the individual and either completes emergency petitions or refers the case for follow-up for alternate services.

Further, the SOP provides that the MCT operates from 9:30 a.m. to 1 a.m., and handles the following types of calls, *id.* at 2:

- Any call involving a psychiatric emergency
- A suicidal person

22

- A person with an emotional or mental health disorder and disconnected from mental health services
- A person in an emotional or situation crisis such as a family conflict
- Critical Incident Support or Critical Incident Stress Management (CISM) requests during hours of operations

In addition, the SOP advises: "The Mobile Crisis Team should **NOT** be dispatched as the primary unit to any situation involving active violence, or to any medical health, or mental health care provider/facility to conduct an assessment, write or serve an Emergency Petition when a qualified/licensed professional is on-site." *Id.* (emphasis in original).

Plaintiffs claim that, by the discovery deadline of May 14, 2018, defendants failed to produce the SOP in response to plaintiffs' Request for Document Productions. ECF 52, ¶ 5. Specifically, they requested "copies of any and all materials which set forth the procedure to be followed in any and all calls." ECF 52-2 ("Request for Production of Documents"), ¶ 31. According to plaintiffs, the failure to produce the SOP (*id.* ¶ 6) "robb[ed] Plaintiffs of the opportunity to question each defendant on its relevance to their respective defenses or challenge its relevance and reliability generally." *Id.* ¶ 7. Further, plaintiffs assert that the SOP "lacks any form of authenticity, it [sic] not self-authenticating and is inadmissible." *Id.* ¶ 9. They also maintain that they "have not had the opportunity to rebut or challenge the contents of the newly revealed material and would be unduly prejudiced if the Court were to consider it in its ruling on Defendants' Motion for Summary Judgment." *Id.*

In their opposition, defendants assert that, in responding to plaintiffs' Request for Production of Documents, the County informed plaintiffs that the SOP and the Police Department's "Field Manual and Administrative Manual" were available for inspection and copying. ECF 53, ¶ 2. Defendants do not cite to an exhibit reflecting that assertion. The defense also claims that the MCT's "functions were repeatedly referenced by Tyrone Powers, plaintiffs'

23

own police practices expert, in his Rule 26 Report . . . ." *Id.* ¶ 3 (citing ECF 47-4); *see also* ECF 46-3 (Exhibit C, Powers Report) at 20, 21, 34, 35) (referencing the MCT. And, as defendants point out, the SOP "was introduced as an Exhibit at Powers' deposition and he was specifically questioned on it." ECF 53, ¶ 3 (citing ECF 53-1, Powers Deposition); *see also* ECF 47-3 (Exhibit Q, Powers Deposition) at 52. Clearly, then, the defense was in possession of the SOP.

In addition, contrary to plaintiffs' assertion that they "have not had the opportunity to rebut or challenge the contents of the newly revealed material," defendants contend that "plaintiffs' counsel questioned both Officer Seckens and Officer Bowman about the Mobile Crisis Team and its' [sic] functions." ECF 53, ¶ 5. Moreover, defendants argue that the SOP is self-authenticating under Fed. R. Evid. 902(5), as it is "a book, pamphlet, or other publication purporting to be published by a public authority." *Id.* ¶ 6.

In the context of a summary judgment motion, Fed. R. Civ. P. 56(c)(1)(A) provides that each side must support its factual assertions with citation to "particular parts of materials in the record . . . ." Under Fed. R. Civ. P. 56(c)(2), a party may object that material cited by the other side "cannot be presented in a form that would be admissible in evidence." But, at the summary judgment stage, a party need not necessarily "produce evidence in a form that would be admissible at trial." *Celotex,* 477 U.S. at 324. When the opposing party objects on admissibility grounds, "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment.

In light of the 2010 amendment to Rule 56, "'facts in support of or opposition to a motion for summary judgment need not *be* in admissible form; the new requirement is that the party identifies facts that *could be* put in admissible form.'" *Grimes v. Merritt*, JKB-11-2687, 2015 WL

24

5158722, at *4 (D. Md. Aug. 31, 2015) (quoting *Wake v. Nat'l R.R. Passenger Corp.,* PWG–12–1510, 2013 WL 5423978 at *1 (D. Md. September 26, 2013)) (emphasis in *Wake*). "Thus, instead of 'a clear, bright-line rule ("all documents must be authenticated"),' Rule 56(c)(2) now prescribes a 'multi-step process by which a proponent may submit evidence, subject to objection by the opponent and an opportunity for the proponent to either authenticate the document or propose a method to doing so at trial.'" *Williams v. Silver Spring Volunteer Fire Dep't,* 86 F. Supp. 3d 398, 407 (D. Md. 2015) (citation omitted); *see also Niagara Transformer Corp. v. Baldwin Techs., Inc.,* DKC 11-3415, 2013 WL 2919705, at *1 n.1 (D. Md. June 12, 2013) ("The 2010 amendments to Fed. R. Civ. P. 56(c)(2) . . . eliminated the unequivocal requirement that documents submitted in support of a summary judgment motion must be authenticated.") (citation and internal quotation marks omitted).

Fed. R. Evid. 902 governs evidence that is self-authenticating. It applies to public documents and "require[s] no extrinsic evidence of authenticity in order to be admitted." Fed. R. Evid. 902. Specifically, under Fed. R. Evid. 902(5), "publication[s] purporting to be issued by a public authority" are self-authenticating. Pursuant to Fed. R. Evid. 902(5), the SOP is self-authenticating as a publication issued by a public authority, the Baltimore County Police Department.

Moreover, it is evident that plaintiffs had access to the SOP by the discovery deadline. Their own expert made use of the SOP. And, plaintiffs do not dispute that Seckens and Bowman were questioned about the MCT. Therefore, I shall deny plaintiffs' Objection (ECF 52).

## V.    The Officers' Motion

Plaintiffs lodge several claims against the Officers: Claim I, Count I for assault; Count II for battery; Count III for violations of the Fourth and Fourteenth Amendments and Articles 26 and

24 of the Maryland Declaration of Rights; Claim I, Count VI for funeral expenses; and Claim II, Count I for wrongful death. The Officers' Motion addresses only Claim I, Count III.

Claim I, Count III, filed under 42 U.S.C. § 1983, is predicated on the Fourth and Fourteenth Amendments to the United States Constitution and Articles 24 and 26 of the Maryland Declaration of Rights. ECF 16, ¶¶ 79-82. Articles 24 and 26 are the Maryland counterparts to the Fourteenth and Fourth Amendments, respectively.[7]

Before discussing the Officers' Motion, it is helpful to review the parameters of 42 U.S.C. § 1983.

Section 1983 provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983; *see, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999); *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, ___ U.S. ___, 135 S. Ct. 1893 (2015). However, § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating

_____

[7] Articles 24 and 26 of the Maryland Declaration of Rights are construed *in pari materia* with their federal analogs. *See, e.g., Littleton v. Swonger,* 502 Fed. Appx. 271, 274 (4th Cir. 2012) ("Articles 24 and 26 are construed *in pari materia* with the Fourth and Fourteenth Amendments of the U.S. Constitution"); *McDaniel v. Arnold,* 898 F. Supp. 2d 809, 847-48 (D. Md. 2012); *Dent v. Montgomery Cty. Police Dep't,* 745 F. Supp. 2d 648, 661 (D. Md. 2010) (Articles 24 and 26 "are construed *in pari materia* with the Fourteenth and Fourth Amendments of the United States Constitution, respectively"); *Doe v. Dep't of Pub. Safety and Corr. Servs.,* 185 Md. App. 625, 636, 971 A.2d 975, 982 (2009) (Article 24 is construed "*in pari materia* with the Due Process Clause of the Fourteenth Amendment"); *Padilla v. State,* 180 Md. App. 210, 226, 949 A.2d 68, 78 (2008) (stating that "the cases are legion in which Maryland Courts have construed Article 26 *in pari materia* with the Fourth Amendment to the United States Constitution"), *cert. denied,* 405 Md. 507, 954 A.2d 468 (2008).

federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017). Therefore, "[t]he first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.

To state a claim under § 1983, "a plaintiff must aver that a person acting under color of state law deprived him of a constitutional right or a right conferred by a law of the United States." *Wahi v. Charleston Area Medical Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *see Filarsky*, 566 U.S. 382-83; *West v. Atkins*, 487 U.S. 42, 48 (1988); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997). The phrase "under color of state law" is an element that "is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips*, *supra*, 572 F.3d at 180 (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982)).

A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk Cty. v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). The Fourth Circuit has said: "[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient." *Philips*, 572 F.3d at 181 (citations and internal quotation marks omitted).

The Fourth Amendment "'provides an explicit textual source of constitutional protection'" with respect to an unreasonable seizure or arrest. *Safar*, 859 F.3d at 245 (quoting *Graham*, 490 U.S. at 395). Therefore, "the Due Process Clause is not the proper lens through which to evaluate law enforcement's pretrial missteps." *Safar*, 859 F.3d at 245. Section 1983 provides a damages

remedy for violations of the Fourth Amendment. *See, e.g., Wilson v. Layne*, 526 U.S. 603, 609 (1999) ("§ 1983 allow[s] a plaintiff to seek money damages from government officials who have violated his Fourth Amendment rights.").

In this case, plaintiffs devote much of their briefing to the question of whether the Officers used excessive force to effectuate Mr. Boyd's detention. *See* ECF 47-1 at 13 ("Maryland law simply does not permit defendant officers to batter, assault, suffocate, and abuse Mr. Boyd to death under the guise of detaining him for an emergency petition."). But, the Officers do not move for summary judgment as to the use of force. ECF 45-1 at 4. To the contrary, the Officers "expressly concede[] that under Rule 56 there are genuine disputes of fact about whether they used excessive force in effecting" the detention of Mr. Boyd. ECF 50 at 1. They explain, ECF 45-1 at 4:

> The Officers submit that the force they used in this case was objectively reasonable, and further, that their actions were not a proximate cause of Mr. Boyd's death. However, the plaintiff, Deona Styron, has asserted under oath that the Officers gratuitously beat Mr. Boyd and that they piled on top of him to the point that he could not breath [sic], thereby asphyxiating him. Therefore, although Defendants do not believe that Styron is a credible witness, they concede that her testimony generates material disputes of fact concerning the Officers' use of force and what, if any, role it played in Mr. Boyd's death. The Officers therefore do not move for summary judgment on that aspect of the case.

Nevertheless, the Officers assert that that they had probable cause to seize and detain Mr. Boyd for an emergency mental health evaluation and, in any event, that they are entitled to qualified immunity. ECF 45-1 at 13. Thus, they have moved for partial summary judgment "on the threshold question of whether they had probable cause to seize and detain Mr. Boyd for an emergency evaluation." ECF 50 at 1. They maintain that "what happened after the Officers attempted to take Mr. Boyd into custody is not relevant to the legal question of whether they had probable cause to detain him." ECF 50 at 6 n.2.

Plaintiffs contend that the Officer defendants "lacked probable cause to seize or detain Boyd for an emergency evaluation," in violation of the Fourth Amendment. ECF 47-1 at 13. They point out that Mr. Boyd was "calm," was "not carrying or brandishing a weapon or anything sharp," and "makes no officer feel threatened or in danger." *Id.* at 14. In support, they cite Officer Bowman's deposition testimony, in which he stated: "Mr. Boyd had no weapons, sharp objects or anything in his hand at the time he was near his neighbor's door." ECF 47-1 at 5 (citing Exhibit J, Bowman Deposition, at 17). Further, plaintiffs point out that "there were no allegations that Mr. Boyd hurt or threatened to hurt himself . . . ." ECF 47-1 at 13. And, they note that "at no point did any officer call for or report that officers were in danger or needed assistance." *Id.* at 13-14 (citing Exhibit J at 8-9).

Therefore, plaintiffs insist that "[t]here was no probable cause" to seize Mr. Boyd. *Id.* At the most, they argue, "there is a genuine dispute of material fact as to whether any individual officer had reason to believe that Mr. Boyd presented a danger to the life or safety of the individual or others." ECF 47-1 at 13.

Plaintiffs also rely on the deposition testimony of Dr. Tyrone Powers, their police practices expert. Dr. Powers opined, Exhibit Q at 62:

> I believe [the Officers] could conclude [Mr. Boyd] needed some assistance. We have a major drug problem, it could be psych or it could be drugs. . . . We have been dealing with that throughout the State of Maryland. I don't know that they automatically conclude what you gave me that he necessarily needed a psych evaluation. I think they do know at that time that this was a physical mental crisis, which is why I indicated in my report at this point, having made those assessments, there are some options they have of reaching out to the Mobile Crisis Unit or the 24 hour crisis line . . . .

Further, Dr. Powers stated that the "circumstances dictated" that the Officers "call and g[e]t a consultation" from the 24-hour crisis line on "how to deal with the situation." *Id.* at 63.

The Officers rely on various provisions of the Health General Article ("H.G.") of the Maryland Code (2015 Repl. Vol., 2017 Supp.), as providing authority to the Officers "to forcibly detain persons and transport them for an emergency mental health evaluation." ECF 45-1 at 13.

In particular, H.G. § 10–622(a) is relevant. It is titled "Petition for emergency evaluation." The statutory section provides that an emergency petition may be made if the petitioner "has reason to believe" that the subject "(1) Has a mental disorder; and (2) The individual presents a danger to the life or safety of the individual or of others." Moreover, H.G. § 10-622(b)(ii) expressly provides that a "peace officer" may make the petition if he or she "personally has observed the individual . . . ."

As to the reasonableness of the Officers' conduct, Section 4-8.1.1 of the Field Manual is also pertinent. It states that a police officer "[m]ust first observe the individual for current symptoms of mental illness" and "upon the officer's own observations or based upon information received from third parties, may file a petition" for protective services. ECF 45-14 at 3. "When an individual meets the emergency petition criteria," the Field Manual directs, *inter alia*, that "the officer *will*: 1. Take the individual into custody, whether or not a crime has been committed." ECF 45-14 at 3-4 (emphasis added).

I agree with the Officers that the seizure of Mr. Boyd was itself lawful. As discussed below, the Officers were legally justified in detaining Mr. Boyd for an emergency medical evaluation.

The Fourth Amendment, at issue here, guarantees, *inter alia*, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend IV. It is made applicable to the States through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). Therefore, to seize and detain an individual

for an emergency mental health evaluation, a police officer "must have probable cause to believe that the individual posed a danger to herself or others before involuntarily detaining the individual." *S.P. v. City of Takoma Park*, 134 F.3d 260, 266 (4th Cir. 1998); *see also Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003) (explaining that if officers did not have probable cause to seize plaintiff for mental health evaluation, then plaintiff asserted a violation of his Fourth Amendment right against unreasonable seizure).

Officers may lawfully seize an individual when "'the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man' to believe that the person poses a danger to himself or others." *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). However, "[t]he law does not permit 'random or baseless detention of citizens for psychological evaluations.'" *Bailey*, 349 F.3d at 740 (quoting *Gooden v. Howard Cty.*, 954 F.2d 960 (en banc) (4th Cir. 1992)).

The concept of probable cause is not subject to precise definition. *United States v. Richardson*, 607 F.3d 357, 369 (4th Cir. 2010). Rather, probable cause "is a 'fluid concept' that cannot be 'reduced to a neat set of legal rules.'" *Bailey*, 349 F.3d at 739 (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). The assessment of probable cause is based on the totality of the circumstances, "rather than on the technical or rigid demands of a formulaic legal test." *United States v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011). In *Maryland v. Pringle*, 540 U.S. 366 (2003), the Supreme Court reiterated, *id.* at 370-71 (citations and quotations marks omitted):

> [T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.

The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances.

*See also Gates*, 462 U.S. at 232; *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949).

The question here is whether the totality of the circumstances justified the seizure of Mr. Boyd, who was not suspected of having committed a crime when the Officers encountered him. *Jones v. Buchanan*, 325 F.3d 520, 527-28 (4th Cir. 2003). It is not enough that plaintiffs "simply plead an absence of probable cause for [their] claim[s] to survive summary judgment." *Pegg v. Hernberger*, 845 F.3d 112, 119 (4th Cir. 2017) (citation and internal quotation marks omitted). Although the Fourth Circuit has recognized that "probable cause or its absence will be at least an evidentiary issue in practically all [§ 1983 wrongful arrest] cases," it has also noted that there is a significant difference between the context of a motion to dismiss and a motion for summary judgment in which the sufficiency of the evidence (as distinct from allegations) can be tested. *Pegg*, 845 F.3d at 119.

Reasonableness is analyzed by weighing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (citation omitted). Under § 1983, in evaluating the Officers' conduct, the determination is made "from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight. . . ." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (addressing claim of excessive force). Notably, the question of reasonableness is "wholly objective . . . without regard to [an officer's] own subjective intent or motivation. Subjectively bad intentions on the part of the individual officer will not make a constitutional violation out of an otherwise reasonable seizure; nor will subjectively good

intentions render an objectively unreasonable seizure constitutional." *Martin v. Gentile*, 849 F.2d 863, 869 (4th Cir. 1988) (internal citations omitted).

One factor in the "reasonableness calculus" concerns "the immediate threat the suspect poses . . . ." *Holloman v. Markowski*, 661 Fed. App'x 797, 800 (4th Cir. 2016) (per curiam), *cert. denied*, ___ U.S. ___, 137 S. Ct. 1342 (2017) (citing *Estate of Armstrong v. Vill. Of Pinehurst*, 810 F.3d 892, 899 (4th Cir. 2016)). Moreover, the court must consider "the proportionality of the force in light of all the circumstances.'" *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005)).

In *Costley v. City of Westminster*, GLR-16-1447, 2017 WL 35437, at *8-9 (D. Md. Jan. 4, 2017), *aff'd sub nom Costley v. Steiner*, 689 F. App'x 753 (4th Cir. 2017), a § 1983 case, Judge Russell of this District concluded that the officers had probable cause to enter the plaintiff's home and involuntarily detain him for a psychiatric evaluation. Therefore, he granted summary judgment to the officers. *Id.* at *10. In reaching his conclusion, Judge Russell determined that the officers relied on a 911 call, as well as "their own observations gleaned from an interview with" the plaintiff's wife and "a protracted verbal exchange" with the plaintiff himself. *Id.* at *9. Specifically, the plaintiff's family had reported that he was suicidal; the plaintiff had recently lost his job; he was taking pain medications for a herniated disk in his back; he had begun taking anti-depressants; and officers observed that he was "hostile, verbally uncooperative, and emotional[ly] unstable, and that he said his life was over." *Id.*

In assessing the question of probable cause, Judge Russell also examined two Fourth Circuit cases: *Gooden*, 954 F.2d at 960, and *S.P.*, 134 F.3d at 260. A review of these cases is helpful here.

In *Gooden*, 954 F.2d at 962, a § 1983 case, Howard County, Maryland police officers appealed the denial of qualified immunity in regard to their decision to detain the plaintiff and transport her for a psychological evaluation. *Id.* at 964.

The officers had received multiple calls from a neighbor that a woman was screaming in an upstairs apartment. *See Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015) (summarizing *Gooden*); *Costley*, 2017 WL 35437, at *7 (same). After arriving at the apartment complex, the officers heard a "long, loud blood-chilling scream" and determined that the scream was coming from the plaintiff's apartment. *Gooden*, 954 F.2d at 962. When they entered the apartment, they heard a second scream from within. *Id.* The officers left, however, because the occupant denied she had been screaming. *Id.* at 963. Immediately thereafter, the officers heard loud thuds and more screaming coming from the apartment. The officers thought that the occupant might be schizophrenic and, when they returned to her apartment, she was unresponsive, nervous, and uncomfortable. *Id.*

As it turned out, the officers were mistaken as to the source of the screams. *Id.* at 966. But, that was not dispositive of the issue. *Id.* Based on the circumstances, the Fourth Circuit found the police conduct objectively reasonable and reversed the district court's denial of the officers' motion for summary judgment on grounds of qualified immunity. *Id.* at 969. The Court emphasized that the officers did not act only on the complaints of the neighbor. Rather, they "waited until the substance of that complaint had been confirmed no less than three times by their personal observations." *Id.* at 966.

In *S.P.*, 134 F.3d at 264, the plaintiff brought a § 1983 action against police officers, among others, claiming a violation of her rights under the Fourth Amendment in connection with her involuntary seizure and transportation for an emergency medical evaluation. *Id.* at 263. As to the

police officers, the trial judge dismissed under Rule 12(b)(6), concluding the officers were entitled to qualified immunity. The Fourth Circuit agreed. *Id.* at 265.

The police officers were dispatched to a possible domestic disturbance and were told that the wife might be suicidal. *See Raub*, 785 F.3d at 883 (summarizing *S.P.*); *Costley*, 2017 WL 35437, at *7 (same). When the officers arrived at the home, they interviewed the female before ultimately deciding to detain her for a mental health evaluation. Although the woman "denied having any suicidal thoughts, being depressed, or being under the care of a physician, she was uncooperative, hostile, very upset, and irrational." *S.P.*, 134 F.3d at 267. She also "admitted that she had a 'painful' argument with her husband and that if not for her children, she would have considered committing suicide." *Id.* The Fourth Circuit concluded that, based on the officers' observations, they had probable cause to seize the plaintiff. Noting that the officers did not decide to detain the plaintiff "in haste," the Court observed that the officers "had ample opportunity to observe and interview [the plaintiff] before making a deliberate decision." *Id.* at 267.

The Fourth Circuit's more recent decision in *Raub*, 785 F.3d at 884, a § 1983 case, is also instructive. In that case, the plaintiff, Raub, alleged that a state mental health evaluator "acted without probable cause in recommending that Raub be taken into custody for a mental health evaluation" and in "petition[ing] the state court for a temporary detention order." *Id.* at 881. The Fourth Circuit determined that, "like the circumstances in *Gooden* and *S.P.*," the evaluator "acted reasonably" based on a number of factors: "the initial observations of law enforcement officers, the content of Raub's Facebook posts, the information provided by Raub's former colleagues, and—later—on [the evaluator's] own evaluation and observations of Raub." *Id.* at 884. Therefore, the Court affirmed the award of summary judgment to the evaluator.

35

In contrast, in *Bailey*, 349 F.3d at 734, law enforcement officers detained the plaintiff based solely on a 911 report that he was intoxicated, depressed, and suicidal. *See Raub*, 785 F.3d at 883 (summarizing *Bailey*). When the officers responded to the plaintiff's home, they found him sitting at his dining room table, eating lunch. *Bailey*, 349 F.3d at 734. The plaintiff denied thoughts of suicide, declined to give the officers permission to search his home, and asked them to leave. *Id.* Soon after the officers left, they returned to the home and subdued the plaintiff by handcuffing him and striking him multiple times in the face. *Id.* The Fourth Circuit concluded that "the 911 report, viewed together with the events after the police officers arrived, was insufficient to establish probable cause to detain [the plaintiff] for an emergency mental evaluation." *Id.* at 741; *see also Cloaninger*, 555 F.3d at 333 (distinguishing a similar situation from *Bailey* on the ground that the officers had more information than the "mere 911 call in *Bailey*.").

Here, the Officers relied on far more information than Mr. Boyd's 911 call as justification to detain him. Mr. Boyd called 911 in the wee hours of the morning, claiming there was an intruder in his home. ECF 45-4 at 4; ECF 45-3. For the remainder of the call, Mr. Boyd was heard arguing, and a woman was heard screaming in the background. *Id.* When Officer Seckens arrived at Mr. Boyd's townhouse, he found no intruder. But, Officer Seckens observed that Mr. Boyd was "sweating profusely" and appeared to be confused and paranoid. ECF 45-5 at 6.

Shortly thereafter, Officers Garland and Bowman arrived. Garland observed that Mr. Boyd was sweating "profusely." ECF 45-9 at 4. Similarly, Bowman noticed that Mr. Boyd was "sweating" and "it wasn't that kind of a hot night outside or anything." ECF 45-10 at 4. He described Mr. Boyd as "very fidgety," and noted that Mr. Boyd "wanted to check all his surroundings, look[ing] everywhere around." *Id.*

Officers Seckens and Bowman remained outside with Mr. Boyd while Garland went inside the townhouse with Styron. ECF 45-9 at 4; *see also* ECF 45-7 at 5. It is uncontroverted that Mr. Boyd then attempted to enter the Officers' vehicles. Although the Officers were in uniform, he screamed, "Help! Call the police." ECF 45-5 at 5. Mr. Boyd then ran to a neighbor's house across the street, continuing to yell for help and asking for someone to call the police, despite the obvious presence of the police. ECF 45-5 at 7; ECF 45-10 at 5; ECF 45-9 at 4. Such behavior, combined with the profuse sweating, was understandably disturbing.

Plaintiffs have not presented any evidence to controvert Mr. Boyd's troubling behavior. To be sure, Styron claims that she never told Officer Garland that Mr. Boyd had been smoking marijuana and drinking alcohol the evening prior. ECF 45-7 at 5. But, even assuming the truth of her claim, it does not alter the fact that Mr. Boyd displayed worrisome conduct. In light of the Officers' firsthand observations of Mr. Boyd's conduct, they had more than sufficient information to support a finding of probable cause to seize and detain him for a mental health evaluation, due to a belief that Mr. Boyd posed a danger to himself and others.

As in *Raub*, *Costley*, *Gooden*, and *S.P.*, the Officers did not merely rely on Mr. Boyd's 911 call. The Officers witnessed Mr. Boyd's irrational behavior, including his continued screaming for someone to call the police, despite the fact that the police had responded, in uniform. The Officers did not seize Mr. Boyd "in haste," but rather they "had ample opportunity to observe . . . [him] before making a deliberate decision." *S.P.*, 134 F.3d at 267.

Accordingly, as to the limited issue presented by the Officers, I shall grant their Motion (ECF 45).

## VI.    The Medics' Motion

In Claim I, the Amended Complaint asserts all counts, except Count IV, against the Medic Defendants. *See* ECF 16.  Claim II, for wrongful death, is asserted against all defendants, including the Medics.

With respect to Counts I and II, for assault and battery, plaintiffs allege: "The conduct of Defendants Armstrong and Burns was . . . without legal justification[] and was motivated by ill will actual malice, specifically a desire to have Mr. Boyd in a comatose like state for transport to the Hospital." ECF 16, ¶¶ 70, 77.[8]  Count III is predicated on violations of the Fourth and Fourteenth Amendments as well as Articles 26 and 24 of the Maryland Declaration of Rights.  *Id.* ¶¶ 79-82. As to Count V, alleging gross negligence, plaintiffs contend that the Medic Defendants "had a duty to not expose Tawon Boyd to unnecessary danger or harm," and that Armstrong "further ha[d] a duty to act in accordance with the [2016 Protocols]."  *Id.* ¶¶ 97-98.  Plaintiffs argue that the Medic Defendants breached such duties by, *inter alia*, injecting Mr. Boyd with Haldol, contrary to the 2016 Protocols, causing cardiac arrest and multi-organ failure; failing to transport him immediately to the hospital "after arriving on the scene and instead allowing Mr. Boyd to continue to suffer obvious medical distress"; and "[i]gnoring Mr. Boyd's initial medical emergency[.]"  *Id.* ¶ 100(a)-(h).

The Medic Defendants contend that they "are entitled to summary judgment on all claims." ECF 44-1 at 5.  Among other things, the defense assert that Burns is entitled to summary judgment because "he had no contact with Mr. Boyd other than helping to place him on the stretcher."  *Id.* at 15.  In addition, both Medics assert that they are entitled to immunity under Maryland law.

---

[8] These bald assertions are without any support in the record, and do little more than detract and distract from the serious issues in the case.

## A. Burns

Burns presents the following facts as undisputed, ECF 51 at 1-2:

1) That he drove the ambulance to and from the scene of this incident; 2) that upon arrival at the scene he went directly over to the two women at the scene (Boyd's fiancé and grandmother, Deona Styron and Linda Burch) and tried to obtain basic background information about Mr. Boyd, and that he had no contact whatsoever with Mr. Boyd or any of the police officers; 3) when he was finished speaking with the women he got the stretcher and brought it over to where Paramedic Armstrong was tending to Mr. Boyd and then helped Armstrong place Boyd on the stretcher and wheel him to the Medic Unit, which only took a matter of seconds.

(Citing Exhibit E at 11-17, 43-48; ECF 44-3 at 5, 8-9; Exhibit K at 13-20; ECF 44-4 at 3).

Plaintiffs argue that Burns is not entitled to summary judgment because "Burns, like Defendant Armstrong, decided not to render immediate aid to Mr. Boyd upon feeling his limp body and noticing he went into cardiac arrest. Burns had a duty to render aid to his patient yet abandoned him for approximately four minutes, allowing precious time to slip by while Boyd was denied oxygen." ECF 48-1 at 12.

According to plaintiffs, there was a "four minute" lapse in treatment, based on the estimated chronology of events documented in the MIEMMS Report (ECF 44-5). The Report provides that Armstrong administered Haldol to Mr. Boyd at approximately 3:36 a.m. and, about two minutes later, Mr. Boyd went into cardiac arrest. *Id.* at 2-3. But, Armstrong did not begin CPR until 3:42 a.m. *Id.* at 3.

Burns responds that "he cannot be faulted for any alleged lapse in providing CPR." ECF 51 at 3 (citing Exhibit K at 27). He posits that "his unrebutted testimony is that he did not even realize that Mr. Boyd had gone into cardiac arrest until they got Boyd into the Medic Unit." *Id.*

The unrebutted evidence shows that Burns met with the Decedent's family on arrival at the scene, in an effort to obtain any useful information. He also brought the stretcher to Armstrong,

wo was tending to Mr. Boyd. The issue of the delay in administering CPR pertains to Armstrong, not Burns. The facts do not support a claim against Burns.

In any event, because Burns and Armstrong raise the same immunity defenses, I shall address those claims collectively.

## B.    State Law Claims

As indicated, the Amended Complaint asserts several State law claims against the Medic Defendants. The parties focus only on Claim I, Count V, alleging "Gross Negligence." *See* ECF 44-1; ECF 48-1; ECF 51.

Armstrong and Burns argue that, as to any State law claims, they are immune from liability under the Maryland Good Samaritan Act, Md. Code (2013 Repl. Vol, 2018 Supp.), § 5–603 of the Courts & Judicial Proceedings Article ("C.J."), because their conduct was not grossly negligent. ECF 44-1 at 15. The Statute provides immunity "to a broad range of persons," including emergency services personnel, such as Burns and Armstrong, operating in accordance with their assigned duties, and without gross negligence. *Tatum v. Gigliotti*, 80 Md. App. 559, 565 A.2d 354 (1989).

"[T]he Maryland Good Samaritan Act provides immunity to specified individuals and entities from liability for ordinary negligence that occurs in connection with assistance or medical care rendered without fee or other compensation at the scene of an emergency or in transit to a medical facility." *TransCare Md., Inc. v. Murray*, 431 Md. 225, 233, 64 A.3d 887, 892 (2013).

Title 5 of the Courts and Judicial Proceedings Article is titled "Limitations, Prohibited Actions, and Immunities." Subtitle 6 is captioned "Immunities and Prohibited Actions – Health and Public Safety." C.J. § 5–603 is titled "Emergency Medical Care."[9] It states, in part:

---

[9] The 2015 amendment to C.J. § 5–603(b)(2) does not appear to be material.

40

(a) In general. — A person described in subsection (b) of this section is not civilly liable for any act or omission in giving any assistance or medical care, if:

    (1) The act or omission is not one of gross negligence;

    (2) The assistance or medical care provided is without fee or other compensation; and

    (3) The assistance or medical care is provided:

        (i) At the scene of an emergency;

        (ii) In transit to a medical facility; or

        (iii)Through communications with personnel providing emergency assistance.

(b) Applicability. — Subsection (a) of this section applies to the following:

    (1) An individual who is licensed by this State to provide medical care;

    (2) A member of any State, county, municipal, or volunteer fire department, ambulance and rescue squad, or law enforcement agency, the National Ski Patrol System, or a corporate fire department responding to a call outside of its corporate premises, if member: . . . .

        (iii) Is certified or licensed by this State as an emergency medical services provider[.]

Of relevance here, the Act affords emergency services personnel immunity from civil damages in the absence of "gross negligence." C.J. § 5–603(a)(1). In Maryland, "[g]ross negligence has been equated with 'wilful and wanton misconduct,' a 'wanton or reckless disregard for human life or the rights of others.'" *Foor v. Juvenile Servs. Admin.*, 78 Md. App. 151, 175, 552 A.2d 947, 956 (1989)). *See Romanesk v. Rose*, 248 Md. 420, 423, 237 A.2d 12, 14 (1968) ("'a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist'") (citation omitted); *Wells v. State*, 100 Md. App. 693, 702-03, 642 A.2d 879, 883-84 (1994) (stating that gross negligence "implies malice and evil intention") (citations and quotations omitted).

*McCoy v. Hatmaker*, 135 Md. App. 693, 699, 763 A.2d 1233, 1236 (2000), *cert. denied*, 364 Md. 141, 771 A.2d 1070 (2001), is instructive. While William McCoy was driving his co-worker to their place of employment, McCoy's head dropped down and the car swerved off the

road. *Id.* at 699, 763 A.2d at 1236. The co-worker grabbed the steering wheel and engaged the emergency brake to prevent the car from hitting parked vehicles. *Id.* at 699-700, 763 A.2d at 1273. After the vehicle came to a stop, McCoy was nonresponsive and was making a gargling noise. *Id.* at 700, 763 A.2d at 1273. The co-worker flagged down a passing police vehicle. Upon checking McCoy's pulse, the policeman told the co-worker that McCoy had a "'small pulse,'" and he called for assistance. *Id.*

Officer Schwaab, who was qualified as a first responder and EMT, arrived on the scene within a minute of the call for assistance. *Id.* Officer Schwaab did not feel a pulse and was about to start CPR when he noticed an ambulance rounding the corner. *Id.* Officer Schwaab then "greeted the ambulance crew with the news that McCoy was in full cardiac arrest" and "Paramedic Hatmaker ran to McCoy's car and assessed his condition." *Id.* at 701, 763 A.2d at 1273. Based on Hatmaker's observations, *inter alia*, that McCoy had no pulse, had dilated and fixed pupils, had released bodily fluids, and had a decreased body temperature, Hatmaker determined that McCoy "was dead and was not a viable candidate for resuscitation." *Id.* at 701, 763 A.2d at 1237.

McCoy's wife, individually and as personal representative of McCoy's estate, brought a wrongful death and survival action, claiming that Hatmaker, Schwaab, and others were grossly negligent in failing to render appropriate aid to McCoy. *Id.* at 701-02, 763 A.2d at 1237-38. According to the plaintiff, the emergency medical responders failed to follow established emergency protocols, set forth in the Maryland State Protocols for Cardiac Rescue Technician and Emergency Medical Technician/Paramedic Guidelines. *Id.* at 701-02, 763 A.2d at 1238.

The trial court granted summary judgment in favor of the defendants on the ground that the plaintiff failed to set forth a prima facie case of gross negligence, as required to establish liability under the Good Samaritan Act, C.J. § 5-603. *Id.* at 705, 763 A.2d at 1239-40. On appeal,

42

the Maryland Court of Special Appeals concluded that any error in medical judgment did not constitute gross negligence. *Id.* at 708, 763 A.2d at 1241. Of import here, the court said, *id.* at 713-14, 763 A.2d at 1244 (emphasis added):

> We agree with the [trial] court's reasoning and believe it to be consistent with the standard we expressed in *Tatum* [*v. Gigliotti*, 80 Md. App. at 568, 565 A.2d at 358 (emphasizing the standard that "gross negligence has been equated with 'wilful and wanton misconduct,' a 'wanton or reckless disregard for human life or for the rights of others.'") (citation omitted)[10]]. Were we Baltimore City officials responsible for Hatmaker's job performance, we might recommend retraining in the protocols of emergency care, or even disciplinary action. *As judges, however, we cannot equate a well-intended error in medical judgment-even if it costs the patient's life-with wanton and reckless disregard for the life of that patient.* Medical protocols seek to establish best practices for successfully treating certain conditions. Failure to follow such protocols might sometimes be deliberate, but more often than not, we believe, such failure to heed them during an emergency would be purely accidental and, therefore, at most simple negligence.[] Even resolving all inferences in appellant's favor, the undisputed facts here simply do not show that Hatmaker's failure falls into the former category. *Appellant cannot point to any facts that show he made a deliberate choice not to give McCoy a chance to survive, and, at the end of the day, it is deliberateness that lies at the core of the Tatum standard of willfulness and wantonness.*

In reaching its decision, the court pointed to the undisputed facts concerning the efforts to assess the decedent's condition and save his life. These included a physical examination of the

---

[10] In *Tatum*, an individual suffering from a severe asthma attack requested emergency aid and subsequently died. 80 Md. App. at 569, 565 A.2d at 368. The paramedics had escorted the individual to the ambulance, rather than transporting him by stretcher, and did not administer much oxygen, because the individual "resisted." *Id.* at 562-63, 565 A.2d at 355. Paramedic Gigliotti testified that the victim slid off the ambulance's bench seat and fell on the ambulance floor when the ambulance rounded the corner. *Id.* at 563, 565 A.2d at 355. The ambulance report, signed by Gigliotti, provided that the victim "'was conscious, stable, pupils normal, and pupils were equal.'" *Id.* The emergency room nurse, however, testified that the victim "was in complete respiratory and cardiac arrest when she encountered him." *Id.* "When asked, *inter alia,* 'whether the administration of oxygen in the ambulance would have permitted Norman Tatum to survive this attack?,' he responded in part that 'lack of oxygen is the main reason why Mr. Tatum showed the findings that he showed at autopsy, and I infer from that caused his death....'" *Id.*

On appeal, the court discussed whether the actions of Gigliotti constituted gross negligence under the Good Samaritan statute. *Id.* at 565, 565 A.2d at 356. It determined that the trial judge properly granted summary judgment, stating: "[A]lthough the actions of defendant Gigliotti may have amounted to negligence, they do not satisfy the threshold of gross negligence." *Id.*

victim, despite the failure to follow other protocols. *Id.* at 708, 763 A.2d at 1241.

As in *McCoy*, plaintiffs allege that defendants failed to comply with the MIEMMS Protocols, and failed to render the appropriate aid to Mr. Boyd. But in this case, it is not even clear that Armstrong failed to comply with the MIEMMS Protocol. As mentioned, *supra*, the 2016 Protocols provided conflicting guidance in administering aid to patients exhibiting symptoms of ExDS. ECF 44-7 at 3. Section LL, "Excited Delirium Syndrome (ExDS)," included an alert that stated, *id.*:

PATIENTS DISPLAYING SIGNS AND SYMPTOMS OF EXDS SHOULD NOT RECEIVE HALDOL AND/OR BENADRYL FOR CHEMICAL RESTRAIN. THESE MEDICATIONS MAY WORSEN AN ANTICHLINERGIC CRISIS. HALDOL MAY INCREASE THE POSSIBILITY OF CARDIAC DYSRHYTMIA BY PROLONGING THE QT INTERVAL AND MAY ALSO INCREASE THE CHANCES OF A SEIZURE BY LOWERING THE BODY'S SEIZURE THRESHOLD.

However, as related to Haldol, the 2016 Protocols remained unchanged. Of import here, Section 19, "Haloperidol (Haldol)," did not specify that the use of Haldol as a "contraindication" for ExDS. ECF 44-9 at 3.

Moreover, plaintiffs have failed to present facts from which a factfinder could infer that Armstrong or Burns acted with willful indifference to Mr. Boyd's wellbeing, or with gross negligence. *See McCoy*, 135 Md. App. at 708, 763 A.2d at 1241. Rather, the record demonstrates the efforts that Armstrong and Burns undertook to assess and improve Mr. Boyd's condition.

When Armstrong and Burns arrived at the scene, they observed a "struggle ensuing between" Mr. Boyd and the Officers. ECF 48-3 at 11. Moments later, Armstrong ran back to the ambulance to grab supplies to administer aid to Mr. Boyd. Exhibit E at 17. Meanwhile, Burns spoke with Styron and Burch to obtain any pertinent information related to Mr. Boyd's health history. Exhibit K at 15-16. Based on Armstrong's training and his observations of Mr. Boyd's

behavior, Armstrong determined that Mr. Boyd was exhibiting symptoms of ExDS, and he administered Haldol at approximately 3:36 a.m., in an effort to subdue Mr. Boyd. Exhibit E at 20. About two minutes later, Mr. Boyd went into cardiac arrest. ECF 44-5 at 2.

About four minutes elapsed before Armstrong began to perform CPR. *Id.* at 3. In that time, Mr. Boyd was placed on a stretcher and taken to the ambulance. Armstrong explained in deposition that he "didn't want to cause like an uproar in the community. That would prevent me from treating [Mr. Boyd] in the back of the ambulance." Exhibit E at 45-46. So, he chose to wait until Mr. Boyd was taken to the ambulance. There, Armstrong administered CPR; he applied defibrillator pads to Mr. Boyd, secured an airway, and started an IV line of epinephrine and fluids. Exhibit E at 65-66; *see also* ECF 44-5 at 3. And, while en route to the hospital, Armstrong consulted the emergency room doctor, Dr. Park, to obtain his permission to administer Dopamine. ECF 44-5 at 2.

Understandably, plaintiffs have second-guessed the Medic Defendants' medical judgment. *See McCoy*, 135 Md. App. at 718, 763 A.3d at 1247. Specifically, plaintiffs point to defendants' failure to administer CPR immediately after Mr. Boyd went into cardiac arrest. They maintain that Armstrong "waited for approximately 4 minutes" and "did not begin[] any life saving measures until Mr. Boyd's limp body was removed from the scene[.]" ECF 48-1 at 18.

Perhaps Armstrong made a poor decision in delaying CPR until Mr. Boyd was taken to the ambulance. Perhaps Armstrong was negligent. But, poor decisions and mere negligence are not sufficient to defeat the statutory immunity. To the contrary, it is negligence that is protected by the statute. And, plaintiffs posit no facts to satisfy the "tougher standard of wanton and reckless disregard for life." *McCoy*, 135 Md. App. at 718, 763 A.3d at 1247. As such, plaintiffs fail to

identify a genuine issue of material fact to preclude summary judgment on the ground of immunity under Maryland's Good Samaritan Act as to the State law claims.

Although not dispositive as to the availability of the underlying immunity, it is noteworthy that plaintiffs proffer no evidence that performing CPR earlier would have saved Mr. Boyd's life. *See* ECF 48-1. In this regard, plaintiffs' expert, Dr. Francisco Diaz, concluded that "Mr. Boyd died as result of asphyxia after restraint." ECF 48-3 (Exhibit I, Diaz Report) at 3. That conduct is not attributable to the Medics.

Dr. Diaz also asserted that the autopsy report's "constellation of injuries" and the "location and extent" of the injuries support his conclusion. *Id.* He opined, *id.*:

> Restraint with the body weight of several adults in another person's back will lead to a chain of events that will preclude the victim from breathing. The consequence is asphyxia and cardio-respiratory collapse.
>
> Even though a pulse was regained after CPR the damage to the brain cells was done and Mr. Boyd sustained the sequelae of multiple organ failure as demonstrated at autopsy. For the reasons above, it is my opinion that the cause of death should have been listed as asphyxia as a result of restraint and the manner of death classified as Homicide.

### C. Federal Claims

Claim I, Count III of the Amended Complaint is predicated on the Fourth and Fourteenth Amendments to the United States Constitution. ECF 16, ¶¶ 79-82. Plaintiffs contend that Burns and Armstrong unlawfully detained Mr. Boyd without probable cause and used excessive force in effecting the detention, in violation of the Fourth and Fourteenth Amendments. ECF 16, ¶¶ 79-82. Further, plaintiffs assert that the Medics violated Mr. Boyd's due process rights under the Fourteenth Amendment. *Id.*

1. **Unlawful Detention & Excessive Force**

Plaintiffs claim that the Medics unlawfully detained Mr. Boyd and used excessive force. They argue: "Haldol was used as a chemical restraint in conjunction with the physical restraint of the defendant officers and caused Mr. Boyd to go into cardiac arrest. . . . Armstrong's actions, in-light-of [sic] the clear injuries suffered by Boyd, were designed to, and did, render Boyd comatose." ECF 48-1 at 19.

As discussed above, the Officers had probable cause to detain Mr. Boyd for a mental health evaluation. It is unrefuted that, by the time the Medics arrived on the scene, Mr. Boyd was already detained; the Medics did not detain him. *See* ECF 45-4 at 11-12. Because Mr. Boyd was not detained by the Medics, plaintiffs' unlawful detention claim against the Medics necessarily fails.

The Medics also assert entitlement to qualified immunity, arguing that their conduct did not constitute excessive force, nor did they violate a clearly established constitutional right of which the Medics should have known. ECF 44-1 at 25. I turn to the claim of excessive force.

"The Fourth Amendment prohibition on unreasonable seizures bars police officers from using excessive force to seize a free citizen." *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003) (citing *Graham*, 490 U.S. at 395). The "'question [is] whether the totality of the circumstances justified a particular sort of . . . seizure.'" *Buchanan*, 325 F.3d at 527-28 (alternation in original) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

The touchstone case with respect to a claim of use of excessive force brought under 42 U.S.C. § 1983 is *Graham v. Connor*, 490 U.S. 386 (1989). In that case, the Supreme Court rejected the notion "that all excessive force claims brought under § 1983 are governed by a single generic standard." *Id.* at 393. The Court said, *id.* at 394:

> In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged

application of force . . . . The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized "excessive force" standard.

"Where . . . the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen," the Court reasoned, "it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Id.* (quoting U.S. CONST. amend. IV*).* Therefore, the Court concluded that claims of "excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen" should be evaluated "under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id.* at 395. "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing' such a claim." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (quoting *Graham*, 490 U.S. at 395).

Whether an officer has used excessive force is analyzed under an objective reasonableness standard. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc); *see Martin v. Gentile*, 849 F.2d at 869. This takes into account "the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396. To determine the reasonableness of an officer's actions "'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Ray*, 781 F.3d at 101 (quoting *Graham*, 490 U.S. at 396). Notably, the officer's actions are examined "in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." *Graham*, 490 U.S. at 397; *accord Pegg*, 845 F.3d at 120 ("'Subjective factors involving the

officer's motives, intent, or propensities are not relevant.'") (quoting *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994)).

Courts looks to various factors in "the reasonableness calculus . . . ." *Holloman*, 661 Fed. App'x at 800. These include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also E.W. by and through T.W. v. Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018); *Estate of Armstrong*, 810 F.3d at 899. However, these factors are not "exclusive," and there could be other "objective circumstances potentially relevant to a determination of excessive force." *Kingsley v. Hendrickson*, ___ U.S. ___, 135 S. Ct. 2466, 2473 (2015). Moreover, the court must consider "the proportionality of the force in light of all the circumstances.'" *Ray*, 781 F.3d at 101 (quoting *Waterman*, 393 F.3d at 481).

Plaintiffs' allegations fail to state a claim of use of excessive force by the Medics. When Burns and Armstrong arrived outside Mr. Boyd's home, they saw a "struggle ensuing" between the Officers and Mr. Boyd. ECF 48-3 at 11. Based on Armstrong's observations of "the way [Mr. Boyd] was acting," Armstrong determined that Mr. Boyd was exhibiting symptoms of ExDS. Exhibit E at 28. As a result, Armstrong decided "to sedate [Mr. Boyd] and calm him down, that way he d[idn't] have to be restrained or was no longer fighting." Exhibit E at 20-21.

In light of the circumstances, Armstrong's decision to sedate Mr. Boyd was reasonable, and did not amount to the use of excessive force under the Fourth Amendment. Notably, plaintiffs fail to cite any cases in which, under circumstances akin to those here, a court has found that a medic used excessive force, in violation of the Fourth Amendment. Accordingly, the Medics are entitled to summary judgment as to plaintiffs' excessive force claim (ECF 44).

49

## 2. Substantive Due Process

Plaintiffs' Fourteenth Amendment Due Process claim concerns substantive due process. The "standard analysis" under the Due Process Clause is a *procedural* due process inquiry that asks "whether there exists a liberty or property interest of which a person has been deprived, and if so . . . whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). "[S]ubstantive due process is a substantially narrower concept than procedural due process, for it serves as 'an absolute check on certain governmental actions *notwithstanding* the fairness of the procedures' used to implement those actions." *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal*, 135 F.3d 275, 287-88 (4th Cir. 1998) (citation omitted) (emphasis in *Front Royal*). "[T]his absolute check is warranted only where *no process* could cure the deficiencies in the governmental action." *Id.* at 288 (internal citation omitted) (emphasis in original).

One thread of substantive due process case law, directed at legislative enactments, extends substantive due process protection to "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal citations omitted). The substantive due process doctrine "'forbids the government to infringe . . . "fundamental" liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" *Id.* at 721 (citation omitted) (emphasis in original).

Another thread of substantive due process case law is directed at executive action. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998) (distinguishing between substantive due process analysis of legislation, as outlined in *Glucksberg*, and substantive due process analysis of

executive action). The executive action thread of the substantive due process doctrine posits that "the Due Process Clause was intended to prevent government officials 'from abusing [their] power, or employing it as an instrument of oppression.'" *Id.* at 846 (citations and some internal quotation marks omitted). Notably, "the cognizable level of executive abuse of power [is] that which shocks the conscience." *Id.*; *accord see Huggins v. Prince George's Cty.*, 683 F.3d 525, 535 (4th Cir. 2012); *Wolf v. Fauquier Cty. Bd. of Supervisors*, 555 F.3d 311, 323 (4th Cir. 2009) ("Only abuse of power which 'shocks the conscience' creates a substantive due process violation.") (citation omitted).

"Defining conduct that shocks the conscience does not draw on any traditional standard of liability from tort law but rather refers, as a constitutional construct of substantive due process, to 'conduct intended to injure in some way unjustifiable by any government interest.'" *Slaughter v. Mayor & City Council of Balt.*, 682 F.3d 317, 321 (4th Cir. 2012) (citation omitted), *cert. denied*, 133 U.S. 616 (2012). The Supreme Court has cautioned that "[t]he Due Process Clause 'does not purport to supplant traditional tort law,'" and therefore it should not "be interpreted to impose federal duties that are analogous to those imposed by state tort law." *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 332 (1986)).

Plaintiffs contend that "the 14th Amendment is implicated here as Defendant Armstrong's conduct far exceeded that of mere negligence and violated the Boyd's [sic] Fourteenth Amendment rights." ECF 48-1 at 19. As discussed above, viewing the facts in the light most favorable to plaintiffs, Armstrong's conduct did not constitute gross negligence. Nor does it satisfy the shock-the-conscience test. *Slaughter*, 682 F.3d at 321. Plaintiffs have failed to demonstrate that Armstrong intentionally sought to injure Mr. Boyd or acted with willful indifference to his

51

wellbeing. As such, plaintiffs' substantive due process claim fails, and the Medics are entitled to summary judgment.

## VII.    The County's Motion for Summary Judgment

Claim I, Count IV, titled "Survival Action for Negligent Supervision, Training, Retention and Custom or Policy of Deliberate Indifference," is lodged against Johnson and the County. ECF 16, ¶¶ 83-94. Plaintiffs assert *Monell* and supervisory liability claims regarding violations of the Fourth and Fourteenth Amendments. *See Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). Claim I, Count VI, for funeral expenses, and Claim II, Count I, for wrongful death, are also asserted against all defendants, including Johnson and the County. ECF 16, ¶¶ 106-109.

### A.    Chief Johnson

The County argues that "Chief Johnson was never served with process in this case and is therefore not a party." ECF 43-1 at 6. But, "the County concedes that the claims asserted against Chief Johnson in his official capacity are really just claims against the County itself." *Id.* (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)).

As indicated, suit was filed in the Circuit Court for Baltimore County on September 7, 2017. ECF 1. The County was served with process on September 15, 2017. *Id.* ¶ 5. On September 26, 2017, the County removed the action to federal court. *Id.* ¶ 1. At the time of removal, "[n]one of the other defendants ha[d] yet been served with process." *Id.* ¶ 5. Plaintiffs then filed an Amended Complaint on October 23, 2017.

Fed. R. Civ. P. 4(m) requires a plaintiff to serve defendants "within 90 days after the complaint is filed." If any defendant is not served within that time, "the court . . . must dismiss the action without prejudice against that defendant or order that service be made within a specified time." *Id.*

52

Pursuant to Fed. R. Civ. P. 4(m), plaintiffs were required to serve Johnson by December 6, 2017. According to the Docket, Johnson was never served with process. *See* ECF 26; ECF 27; ECF 28; ECF 29; ECF 30; ECF 32. Therefore, to the extent Count IV is asserted against Johnson in his personal capacity, it is subject to dismissal.

To the extent that plaintiffs sued Johnson in his official capacity, the claims against him are duplicative of plaintiffs' claims against the County. "If, as in this case, the government entity has received an opportunity to respond to a suit filed against one of its agents in his or her official capacity, the suit is in all respects, other than name, a suit against the entity." *Vincent v. Prince George's Cnty.*, 157 F. Supp. 2d 588, 595 (D. Md. 2001); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Huggins*, 683 F.3d at 532 (treating suit against individuals in official capacity as suit against County).

## B. The County

The County has moved for summary judgment as to the *Monell* and supervisory liability claims (Claim I, Count IV). ECF 43-1 at 6-9. Also, it asserts that it "is immune from the State law claims," pursuant to the Local Government Torts Claims Act ("LGTCA"), C.J. §§ 5–301 *et seq.* ECF 43-1 at 9-10.

### 1. Federal Claims

The County maintains that plaintiffs fail to "prove that one or more of the individual Defendants committed a constitutional violation." ECF 43-1 at 7. However, the Officers concede that a genuine issue of material fact exists as to whether they subjected Mr. Boyd to excessive

force, in violation of the Fourth Amendment. ECF 45 at 4. Therefore, I shall address plaintiffs' *Monell* claims.

Pursuant to *Monell*, 436 U.S. 658, a municipality is subject to suit under § 1983, based on an unconstitutional policy or custom of a municipality, resulting in a violation of a plaintiff's constitutional rights. But, liability attaches "only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original); *accord Holloman,* 661 Fed. App'x at 799.

A viable § 1983 *Monell* claim contains two elements: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional "policy or custom" caused a violation of the plaintiff's constitutional rights. *See, e.g.*, *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

In *Monell*, 436 U.S. 658, the Supreme Court determined that a local governmental body may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only if those defendants were executing an official policy or custom of the local government that resulted in a violation of the plaintiff's rights. *Id.* at 690–91. The Court said that, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694; *see also Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).

A plaintiff may demonstrate the existence of an official custom or policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference

to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan Cty.*, 520 U.S. at 403–04.

"An official policy often refers to 'formal rules or understandings ... that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir.1999) (alteration in *Semple* and citations omitted). But, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Id.*

"Outside of such formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003). A policy or custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987); *see Holloman*, 661 Fed. App'x at 799. In addition, "a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the

state." *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984). (internal citations omitted).

In *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d at 402, the Fourth Circuit reiterated that, to establish a *Monell* claim, the plaintiff "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" (quoting *Spell*, 824 F.2d at 1386-91) (alteration in *Owens*). Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must ... adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

A policy or custom that gives rise to § 1983 liability will not, however, "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan*, 743 F.2d at 230. Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as a "policy or custom" actionable under § 1983. *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997) (citing *Canton*, *supra*, 489 U.S. at 389).

Under the condonation theory of liability, "a city violates § 1983 if municipal policymakers fail 'to put a stop to or correct a widespread pattern of unconstitutional conduct.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1389). In such a case, however, a plaintiff must show "a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824

F.2d at 1386-1391). Both "knowledge and indifference can be inferred from the 'extent' of employees' misconduct." *Owens*, 767 F.3d at 402-03 (quoting *Spell*, 824 F.2d at 1391). But, only "'widespread or flagrant'" misconduct is sufficient. *Owens*, 767 F.3d at 403 (quoting *Spell*, 824 F.2d at 1387). In contrast, "[s]poradic or isolated" misconduct is not. *Owens*, 767 F.3d at 403.

Notably, a municipality cannot be held liable in a § 1983 action under a theory of respondeat superior. *Monell*, 436 U.S. at 693–94. Rather, "[l]iability arises only where the constitutionally offensive acts of city employees are taken in furtherance of some municipal 'policy or custom.'" *Milligan*, 743 F.2d at 229 (citing *Monell*, 436 U.S. at 694). In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is ... the 'moving force' behind the particular constitutional violation." *Spell*, 824 F.2d at 1387 (internal citations omitted); *see Moore v. Howard County Police Dep't*, No. CCB–10–1430, 2010 WL 4722043, at *2 (D. Md. Nov. 15, 2010).

In *Connick v. Thompson*, 563 U.S. 51 (2011), the Supreme Court explained, *id.* at 60 (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (citing *Monell*, 436 U.S. at 665–683 [ ] ). They are not vicariously liable under § 1983 for their employees' actions. *See id.*, at 691[ ]; *Canton*, 489 U.S. at 392[ ]; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (collecting cases).

In support of their *Monell* claims, plaintiffs identify two unconstitutional policies or customs. In sum, they first claim a policy permitting use of excessive force. ECF 16, ¶¶ 61, 62. Second, they cite the failure to have a crisis team available in the early morning hours. ECF 46-1 at 9-15.

The Amended Complaint alleges, ECF 16, ¶ 61: "The Baltimore County Police Department and Chief Johnson have permitted police practices and customs within the police department that have allowed some citizens to be subjected to police brutality and in some instances death." Plaintiffs then list three examples of use of excessive force involving Baltimore County officers, *id.* ¶ 62:

> a) The June 10, 2016 early morning unlawful entry into the apartment of and beating of Ms. J. Scott by at least 5 Baltimore County Officers. Ms. Scott's incident was video recorded and reported to the police department; b) the June 26, 2015 early morning shooting death of an unarmed black man, Spencer Lee McCain, on account of believing he was in "a defensive position." Baltimore County Officers shot at Mr. McCain at least 19 times; and c) the August 4, 2016 shooting death of an African American woman, Korryn Gaines, and serious injury to her minor child while victims Gaines and the minor child were negotiating leaving their apartment where police allegedly responded to the unit on behalf of Gaines as a victim of domestic violence.

The Amended Complaint avers: "Despite such reports and public complaints regarding these named incidences, neither Baltimore County Police Department nor former Chief Johnson, had a use of force policy that prohibited an officer's use of deadly force on a citizen in their control or custody not presently exerting any force against said officers or anyone else." *Id.* ¶ 63.

However, the County points out that it "does in fact have a Use of Force policy that prohibits its officers from using deadly force unless the officer or another person is facing serious injury or death." ECF 43-1 at 7-8. Section 12-1.2 of the Field Manual, titled "Use of Deadly Force," provides, in relevant part, ECF 43-2 at 5-6:

**GENERAL**
- The use of deadly force is most commonly associated with firearms, but is not limited to such weapons. It may include other less lethal weapons, issued equipment, hands/feet, or any instrument of necessity such as a flashlight or any object at hand.

58

**SWORN MEMBERS**

- Deadly force may be applied in immediate danger situations, where present peril or jeopardy exists and the officer has a reasonable belief that action must be taken instantly or without considerably delay.

- The determining factor in a deadly force decision is not the crime being committed, but the level of force being used, along with the immediate potential for death or serious bodily injury to the officer or innocent bystanders/victims.

Further, the County argues that the "Baltimore County Police department responds to thousands of calls for service each year. Merely citing three isolated incidents in two years is insufficient as a matter of law to establish that Baltimore county has a custom or policy of fostering or tolerating police brutality, or that it is deliberately indifferent to it." ECF 43-1 at 8. In support, the County cites the following excerpt from *Lytle v. Doyle*, 197 F. Supp. 2d 481, 495 (E.D. Va. 2001), *aff'd on other grounds*, 326 F.3d 463 (4th Cir. 2003):

> It is well settled that isolated incidents of unconstitutional conduct by subordinate employees are not sufficient to establish a "custom" for § 1983 purposes. *See Carter*, 164 F.3d at 220 (stating that "meager history of isolated incidents" does not approach the "widespread and permanent practice necessary to establish municipal custom"); *Kopf v. Wing*, 942 F.2d 265, 269 (4th Cir. 1991) (holding that custom or practice claims require proof of "numerous instances" of unconstitutional conduct); *Milligan v. City of Newport News*, 743 F.2d 265, 269 (4th Cir. 1991) (holding that municipal policy or custom cannot arise from isolated constitutional deprivations by municipal employees).

I agree with the County. Two of three examples presented by plaintiffs are factually quite dissimilar. Here, the officers responded to Mr. Boyd's call. They physically restrained Mr. Boyd, after they witnessed disturbing behavior by him, but they did so *without the use of any firearm*. Nor do the examples illustrate a persistent and widespread practice of the use of the kind of force at issue here. *See Owens*, 767 F.3d at 403; *Carter*, 164 F.3d at 220; *see also Peters v. City of Mount Ranier*, GJH-14-00955, 2014 WL 4855032, at *6 (D. Md. Sept. 29, 2014) (concluding that "three solitary examples" of false arrests were "insufficient, as a matter of law, to demonstrate this existence of an official municipal custom or policy"); *McDonnell v. Hewitt-Angleberger*, WMN-

11-3284, 2012 WL 1378636, at *3 (D. Md. Apr. 9, 2012) ("[T]he existence of a total of three isolated incidents (including Plaintiff's incident) does not demonstrate sufficient duration or frequency to impute constructive knowledge of a custom of brutality to the County.").

As noted, plaintiffs also point to the County's policy of "not having crisis members available to help persons in mental health emergencies" during the hours between 1 a.m. and 9:30 a.m. Plaintiffs assert that as a direct result of such policy, "Mr. Boyd was physically attacked by the responding officers who ignored his inability to communicate with responders and escalated their encounter into a use of deadly force; and, created the erroneous perception of the need for a chemical restraint." ECF 46-1 at 13.

In support, plaintiffs cite the report of their expert, Dr. Powers, who stated, Exhibit C at 25:

> The actions taken by Baltimore County Police Department police officers [were] inconsistent with police policies, practices and training for assisting a citizen in physical and mental distress. The actions taken defeat[ed] the purpose of helping Mr. Boyd to get the medical attention he needed to address his condition and possibly save his life.

Dr. Powers further concluded, *id.* at 26 (emphasis in original):

> The force utilized against Mr. Boyd was excessive and deadly. Deadly force is defined as any force applied *in any manner* by *any means* that could reasonably be expected to cause death or *serious physical injury*. Officer Bowers punched Mr. Boyd in his face as he – Mr. Boyd – was situated in a prone position while other officers holding him down. Mr. Boyd did not punch Officer Bowers or any other officer. By all accounts Mr. Boyd was suffering from mental and health issues. Almost all police training – to include Baltimore County Police Department polices [sic] and training – directs police officers to minimize the severity of force and in doing so to avoid blows or strikes to the cranial area. Such blows or strikes to the cranial area should be reserved for deadly force situations where and [sic] officer is protecting himself from death or serious bodily injury.

Plaintiffs contend that, "while Baltimore County Police Department has a protocol for dealing with mentally ill citizens and citizens in crises . . . , this protocol . . . failed to provide

essential crisis response team members to mentally ill citizens after [1 a.m.]." ECF 46-1 at 14. As examples, plaintiffs note the three incidents of excessive force listed in Paragraph 62 of their Amended Complaint. ECF 16, ¶ 62. They argue that this policy, "along with the County's failure to train midnight officers and responding EMT's to cope with mentally ill patients, directly contributed to violations of Mr. Boyd's constitutional right to be free from excessive force." *Id.*

In response, the County argues that plaintiffs fail to identify any "case law suggesting that a municipality is constitutionally required to provide its citizens a Mobile Crisis Team." ECF 49 at 3. And, plaintiffs' own expert, Dr. Powers, conceded that "there is no national police standard requiring departments to have Mobile Crisis Teams available 24 hours a day." *Id.* (citing ECF 49-1 ("Powers Deposition") at 2). Further, Dr. Powers agreed that the Baltimore County Police Department is accredited by the National Commission on Accreditation for Law Enforcement Agencies, and "most importantly they follow the Maryland Police Training Commission, which oversees the police departments in the State of Maryland." ECF 49-1 at 3.

Plaintiffs' second proposed policy fails for the same reason as the first. The three incidents cited by plaintiffs do not approach the "widespread and permanent practice necessary to establish municipal custom." *See Carter*, 164 F.3d at 220. Moreover, plaintiffs fail to demonstrate that these incidents involved citizens suffering from mental health problems, and that the County's policy of not having crisis team members available after 1 a.m. contributed to the use of excessive force against Mr. Boyd.

Accordingly, I shall dismiss plaintiffs' *Monell* claims against the County.

### 2.    State Law Claims

The County argues that, pursuant to the LGTCA, C.J. §§ 5-301 *et seq.*, it is immune from liability for plaintiffs' State law claims. ECF 43-1 at 9. However, it "concedes that it will be liable

up to the statutory limits for any verdict entered against any of the individual defendants on any of the Maryland state claims." *Id.*

Preliminarily, it is helpful to understand the background of the LGTCA. "With the enactment of the LGTCA, the [Maryland] Legislature sought to provide 'a remedy for those injured by local government officers and employees, acting without malice in the scope of their employment, while ensuring that the financial burden of compensation is carried by the local government ultimately responsible for the public officials' acts.'" *Rios v. Montgomery Cty.*, 157 Md. App. 462, 475-76, 852 A.2d 1005, 1012 (2004) (quoting *Ashton v. Brown*, 339 Md. 70, 108, 660 A.2d 447, 466 (1995)), *aff'd* 386 Md. 104, 872 A.2d 1 (2005). However, "the LGTCA does not waive governmental immunity or otherwise authorize any actions directly against local governments." *Williams v. Maynard,* 359 Md. 379, 394, 754 A.2d 379, 388 (2000). Rather, local governments are responsible for payment of any judgments. *See* C.J. § 5–303; *Housing Auth. v. Bennett*, 359 Md. 356, 357-58, 754 A.2d 367, 367-68 (2000) (superseded in part by statute as to other grounds).

C.J. § 5–303(b)(1) provides that "a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government." C.J. § 5–303(b)(1). Section 5–303(b)(2) prohibits a local government from "assert[ing] governmental or sovereign immunity to avoid the duty to defend or indemnify an employee" established in § 5–303(b)(1). C.J. § 5–303(b)(2). *See Balt. Police Dep't v. Cherkes*, 140 Md. App. 282, 318, 780 A.2d 410, 431 (2001).

Sections 5–303(d) and (e) expressly reserve the preexisting common law and statutory defenses and immunities of local government employees, and the right of the local government to assert such defenses and immunities, as follows:

(d)     Notwithstanding the provisions of [§ 5-303(b),] this subtitle does not waive any common law or statutory defense or immunity in existence as of June 30, 1987, and possessed by an employee of a local government.

(e)     A local government may assert on its own behalf any common law or statutory defense or immunity in existence as of June 30, 1987, and possessed by its employee for whose tortious act or omission the claim against the local government is premised and a local government may only be held liable to the extent that a judgment could have been rendered against such an employee under this subtitle.

C.J. § 5–303(d), (e); *see also Cherkes*, 140 Md. App. at 318, 780 A.2d at 431.

"A state's right to governmental immunity is 'deeply ingrained in Maryland law' and may not be waived in the absence of express or implied statutory authorization." *Devi v. Prince George's Cty.*, DKC-16-3790, 2017 WL 3592452, at *2 (D. Md. Aug. 21, 2017) (quoting *Nam v. Montgomery Cty.*, 127 Md. App. 172, 182, 732 A.2d 356, 362 (1999)). And, a municipality, such as the County, is also entitled to governmental immunity. *See Nam*, 127 Md. App. at 182, 732 A.2d at 362 ("When the state gives a city or county part of its police power to exercise, the city or county to that extent is the state."). In general, a municipality is "immune from common law tort suits when engaged in governmental, as opposed to proprietary, acts." *Devi*, 2017 WL 3592452, at *2 (citing *Nam*, 127 Md. App. at 182, 732 A.2d at 362; *DiPino v. Davis*, 354 Md. 18, 47, 729 A.2d 354, 369-70 (1999)).

Therefore, the County is immune from liability for the tortious conduct of its police officers. *See Gray-Hopkins v. Prince George's Cty.*, 309 F.3d 224, 234 ("Under Maryland law, a county 'is immune from liability for tortious conduct committed while the entity was acting in a governmental capacity.'") (quoting *DiPino*, 354 Md. at 47, 729 A.2d at 370).

63

To be sure, C.J. § 5–303(b) requires the County to indemnify its officers for damages resulting from their own tortious acts. But, the LGTCA does not permit plaintiffs to name the County directly in a common law tort suit. *See, e.g, Devi*, 2017 WL 3592452, at *2; *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 378 (D. Md. 2011); *Martino v. Bell*, 40 F. Supp. 2d 719, 722 (D. Md. 1999) (citing *Dawson*, 896 F. Supp. 537, 539 (D. Md. 1995)).

Accordingly, government immunity bars Claim I, Count VI, and Claim II, Count I, as to the County.

## VIII.  Conclusion

For the reasons stated above, I shall DENY plaintiffs' Motion to Strike (ECF 38) as well as plaintiffs' Objection (ECF 52). I shall GRANT the County's Motion for Summary Judgment (ECF 43), the Medics' Motion for Summary Judgment (ECF 44), and the Officers' Motion for Partial Summary Judgment (ECF 45).

Several counts against the Officers remain: Claim I, Count I for assault; Claim I, Count II for battery; plaintiffs' excessive force claim under Claim I, Count III; Claim I, Count VI for funeral expenses; and Case II, Count I for wrongful death.

An Order follows, consistent with this Memorandum Opinion.

Date: March 29, 2019                                   /s/
                                              Ellen L. Hollander
                                              United States District Judge